UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PIONEER NATURAL RESOURCES | § | |
| USA, INC.; MARATHON OIL COMPANY; | § | CIVIL ACTION NO. 05-0224 |
| NIPPON OIL EXPLORATION U.S.A. LIMITED; | § | SECTION "T" |
| TOTAL E&P USA, INC.; BP EXPLORATION | § | MAGISTRATE "3" |
| & PRODUCTION, INC.; and MARUBENI OIL | § | |
| & GAS (USA), INC. | § | |
| | § | HON. G. THOMAS PORTEOUS, JR. |
| v. | § | |
| | § | |
| DIAMOND OFFSHORE COMPANY and | § | MAGISTRATE JUDGE, |
| DIAMOND OFFSHORE (TRINIDAD) L.L.C. | § | DANIEL KNOWLES, III |

### DIAMOND DEFENDANTS'
### REPLY IN SUPPORT OF MOTION TO STRIKE EXPERT WITNESSES
### AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

1. Diamond Offshore Co. and Diamond Offshore (Trinidad) L.L.C. (collectively "Diamond Offshore" or "Diamond Defendants") file this Reply in Support of their Motion to Strike Expert Witnesses and Motion for Summary Judgment.

**I.   FACTUAL BACKGROUND**

2. As Plaintiffs acknowledge, their case is dependent on expert testimony. Response to Motion to Strike at 3 ("This is the type of case that requires expert witnesses."). Without expert testimony, Plaintiffs cannot hope to establish that Diamond was negligent, that Diamond's negligence caused the *Ocean America* to allide with Plaintiffs' pipeline, or that such an allision

1

caused the damage for which they seek recovery. Plaintiffs' experts have woven an unfounded, complex theory of causation, based entirely upon insufficient circumstantial evidence, in an effort to lay the blame for their loss at Diamond Offshore's doorstep:

1. Plaintiffs contend that Diamond Offshore was negligent in failing to try to outrun a catastrophic hurricane as it moved northwest through the Gulf of Mexico. However, Plaintiffs' lone operations expert, Captain John Manders, failed to evaluate the feasibility of such an act and failed to identify any occasion in which a semi-submersible rig the size of the *Ocean America* had ever succeeded in such a maneuver, and, indeed, testified that the only occasion he could specifically recall, resulted in the capsizing of a vessel that was overtaken by a storm, causing the death of six men.

2. Based on computer models submitted by their expert, Dr. Brown, Plaintiffs allege that the rig drifted to the northwest and over their pipeline after it lost station as a result of the hurricane. Dr. Brown's models are demonstrably inaccurate. His "preferred" model places the final location of the *Ocean America* 13 nautical miles from the only location of the *Ocean America* that is confirmed; the location where it was re-boarded after the storm. Plaintiffs are therefore reduced to arguing that the rig "passed over the pipeline" at some unspecified location—a conclusion that is self-evident because the rig was moored east of the pipeline before the storm and was recovered west of the pipeline after the storm.[1]

3. Plaintiffs claim that the rig dragged a mooring line leaving a "continuous trench" spanning the distance from the mooring site of the *Ocean America* to the damaged pipeline. There are several time and coordinate gaps in Plaintiffs' navigational data, rendering it unreliable. The alleged trench contains sessile marine life forms and buried debris that establish the trench was not caused by the passage of the rig during the September 2004 storm. The trench itself also changes characteristics and disappears so frequently it cannot be the work of a single, dragged chain. Further, Plaintiffs' only proposed expert testimony on the trench, purporting to link the alleged "trench" to the *Ocean America* is equally unreliable. Dr. Mousselli has no expertise in determining the cause of features on the floor of the ocean. He has never been engaged for such an analysis in his life. Thus, Plaintiffs cannot demonstrate that he has undertaken the identification of the origins of similar ocean-floor features.

---

[1] Plaintiffs also claim the models show the rig passed over the pipeline somewhere "close" to where the damage was suffered. This conclusion depends on whether the models accurately depict the path the rig took while adrift during the storm. The models are not sufficiently accurate to pinpoint where the rig was when it passed over the pipeline. Dr. Brown himself testified that they were only accurate to within a matter of a few miles. But even if the models could demonstrate that the rig passed the pipeline "close" to the point where it was damaged, that does not establish what Plaintiffs need to prove. Plaintiffs must prove that it is more likely than not that the rig's mooring lines in fact impacted the pipeline *at the point* of damage.

4. Plaintiffs allege that after being dragged for 17 nautical miles, the wire rope and anchor chain trailing after the rig inexplicably dropped approximately 4 miles after the rig passed over the pipeline. Plaintiffs use this theory to attempt to link a wire rope they recovered from the ocean floor to the moorings of the *Ocean America*.[2] The attempt to match the wire rope to the rig fails because the metallurgical characteristics of the wire rope Plaintiffs recovered are demonstrably different from the wire rope used to moor the rig. Plaintiffs' expert, Dr. Busch, did not conduct any metallurgical tests to determine whether the hardness profile or coating thickness of the samples recovered from the rig matched the wire rope Plaintiffs recovered.

5. Plaintiffs' damages expert, Dr. Gore, relies on an improbable series of assumptions to inflate Plaintiffs' damages claims. Dr. Gore fails to conduct a proper analysis under Fifth Circuit standards. Proper analysis demonstrates that Plaintiffs were paid *more* for their gas as a result of shutting in their wells than they would have been paid had the shut-in not occurred. Dr. Gore relies solely on a specific reserve estimate that Plaintiffs prepared. That estimate failed to take into account the increasing water production and erratic gas production experienced in the well at issue. Dr. Gore also used "spot" prices for gas rather than relying on the prices actually paid to Plaintiffs to prepare his damages model. Dr. Gore also used a discount rate for which he provides no justification (other than stating he was told to do so). Dr. Gore's inaccurate methodology and factual foundation render Plaintiffs' damages claim unreliable.

## II.  ARGUMENTS & AUTHORITIES

### A. The Court Cannot Accept Plaintiffs' Plea to Allow Unreliable Expert Testimony into Evidence

3. Plaintiffs' primary argument in their Response to the Motion to Strike is that the Court should ignore the errors and methodological failures in their proposed expert testimony on the theory that the trier of fact can sort out these errors and discrepancies at trial. Thus, Plaintiffs invite the Court to disregard its duty to act as a gatekeeper regarding admission of expert testimony under *Daubert*. If it were sufficient for a Court to simply rely on cross-examination of experts and trust the trier of fact to resolve errors and discrepancies in scientific testimony at trial, then Plaintiffs' position is that *Daubert* was decided incorrectly.

---

[2] Plaintiffs need this conclusion to explain the undisputed fact that when the rig was recovered after the storm, its moorings had parted at or near the fairleaders, indicating that the rig did not drag 8000 feet of rope and chain in its wake as it drifted during the storm.

4. The Fifth Circuit has explained that a District Court cannot simply abandon its gatekeeping duties under *Daubert*. *Watkins v. Telesmith, Inc.*, 121 F.3d 984 (5th Cir. 1997). In *Watkins*, the court explained that "[t]he Supreme Court held that when expert testimony is offered, the trial judge *must* perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Id.* at 988-89 (emphasis added). The court rejected the notion that the District Court can refuse to apply a *Daubert* standard to certain kinds of testimony, holding that the gatekeeping role of the trial court under *Daubert* is mandatory. The court in *Watkins* adopted the Seventh Circuit's view that "a conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence," quoting *Navarro v. Fuji Heavy Indus., Inc.*, 117 F.3d 1027 (7th Cir. 1997).

5. Plaintiffs' argument that the Court should not apply the *Daubert* standards in a bench trial (Response at 6) is contrary to the law. *Daubert* was based on the language of Fed. R. Evid. 702. The Rules of Evidence apply in bench trials just as they do in a jury trial. Neither hearsay nor irrelevant evidence are inadmissible in a bench trial. The case law makes clear that courts apply *Daubert* standards to determine the admissibility of expert evidence in bench trials. *See, e.g., Cleveland ex. rel. Cleveland v. United States*, 457 F.3d 397 (5th Cir. 2006) (*Daubert* standard applied in a bench trial to exclude testimony of a physician regarding standard of care for emergency-room doctors); *St. Martin v. Mobil Exploration & Prod. U.S., Inc.*, 224 F.3d 402 (5th Cir. 2000) (holding that District Court abused its discretion in admitting expert testimony that failed to meet *Daubert* standards in a bench trial). Contrary to the argument advanced by Plaintiffs, the Fifth Circuit has unambiguously held that district courts are required to apply *Daubert* standards in admiralty cases:

> ***Daubert** v. Merrell Dow Pharmaceuticals, Inc.* established the baseline criteria for scientific expert testimony; *Kumho Tire Co. v. Carmichael* extended ***Daubert*** to all forms of expert testimony; and **these principles apply in admiralty matters.**

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360 (5th Cir. 2006) (emphasis added).

6.  Given the obligation of the Court to conduct a *Daubert* analysis of proposed expert testimony, Plaintiffs' repeated claims that the Court should disregard conceptual and factual errors in Plaintiffs' proposed expert testimony must be rejected.

### B.  Plaintiffs Fail to Address Many of the Errors and Methodological Deficiencies in Their Proposed Expert Testimony

7.  Plaintiffs do not address many of the serious methodological deficiencies and factual errors underlying their proposed expert testimony. For example, Plaintiffs do not address the issues raised as to the unreliability of their "trench" data. Plaintiffs also fail to address the undisputed fact that the "trench" video plainly and repeatedly shows the presence of debris and fully-formed adult sessile marine life forms in the bottom of the alleged "trench" that establish the "trench" could not have been formed during the passage of Hurricane Ivan. Despite Plaintiffs' claim, there is no "difference of expert opinion" on this point. Plaintiffs have submitted no expert testimony establishing that the trench was created during Ivan; the only expert testimony establishes the trench is more than 117 days old.

8.  Plaintiffs also do not address the undisputed fact that actual metallurgical testing of the wire rope recovered by Plaintiffs has characteristics (i.e., hardness profile and coating thickness) that establish the wire did not match any of the rope on the *Ocean America*.

9.  Plaintiffs also fail to address the fact that Dr. Brown's alleged "drift analysis" fails to place the *Ocean America* anywhere near the location where it was found after the storm, indicating that the model is not an accurate method for determining the path of the rig during the storm.

5

10. Plaintiffs do not explain or justify Dr. Gore's use of spot prices for gas. They do not address that Dr. Gore failed to conduct a proper *Hise* analysis under Fifth Circuit standards.

11. Plaintiffs do not explain how Captain Manders, a "professional witness" who derives virtually 100% of his income from testifying, can opine on the sufficiency of Diamond's mooring analysis and API standards when he testified that he lacked expertise in those areas. Nor do Plaintiffs attempt to justify Captain Manders' claim that Diamond should have tried to outrun the hurricane when he did no analysis regarding the feasibility of such a dangerous maneuver.

12. Plaintiffs do not address the lack of reliable factual foundation and reliable methodology of their experts' opinions. In other words, Plaintiffs seek to ignore *Daubert* and invite the Court to commit error in doing so. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("conclusions and methodology are not entirely distinct from one another.... A court may conclude that there is simply too great of an analytical gap between the data and the opinion proffered.")

13. For example, Plaintiffs' response to the metallurgical analysis performed by Defendants' expert is to quote a one-line conclusion from Dr. Brown that he "believes" that the wire rope at the end of the trench came from the *Ocean America*. Response at 9. Dr. Brown is not a metallurgist, thus he performed *no* analysis of the wire rope recovered by Plaintiffs, nor did he examine the moorings of the *Ocean America*; hence, his belief is not entitled to consideration under *Daubert*. Nothing in his report indicates that he is qualified to opine on the source of the wire rope Plaintiffs recovered. His subjective beliefs are not relevant to the issues presented in this case. Unless his opinion regarding the source of the wire rope is grounded on some scientifically valid and reliable analysis, it is inadmissible. *Watkins, supra*. "A conclusion

without any support is not one based on expert knowledge and entitled to the dignity of evidence." *Id.* at 991 n.11.

14. Plaintiffs' defense of the testimony of Dr. Mousselli and Captain Manders is equally invalid. With regard to both Dr. Mousselli and Captain Manders, Plaintiffs rely largely on the experts' alleged qualifications as a basis to allow their testimony. They contend that these experts can opine on the issues, without performing any analysis simply because they have experience. Regarding Dr. Mousselli's opinion that the "trench" was caused by a wire rope, Plaintiffs argue that as an engineer who has overseen construction of undersea pipelines, he is qualified to express an opinion. Response at 11. They do not point to any tests or analyses actually performed by Dr. Mousselli to support his opinion. Similarly, Plaintiffs' defense of Captain Manders' opinions is based solely on his purported qualifications. They do not discuss his "methodology," because his report and his deposition confirm that he conducted no research or analysis to support his conclusions.

15. The Fifth Circuit rejected this attempt to circumvent the *Daubert* requirements in *Watkins*. In *Watkins*, the trial court had disallowed expert testimony from an engineer regarding possible alternative designs for a piece of equipment that he alleged would have prevented an accident. The engineer performed no tests on his proposed alternative design to ensure that it would work as he suggested, and the Fifth Circuit held that the testimony was properly excluded. The *Watkins* court held that mere reliance on an experts' alleged familiarity with the subject-matter was insufficient, reflecting a "pre-*Daubert* sensibility." To be admissible, it is not enough for an expert to fall back on his general professional experience without providing any

explanation of how he applied that experience in reaching his conclusions. Expert testimony requires both analysis and application of an expert's specialized knowledge.[3]

### C. Plaintiffs Misrepresent Defendants' Position

16. Plaintiffs argue (1) that the Diamond Defendants represent in their Motion that certain testimony by Mr. McCaslin was regarding production from the DC 133-2 well; and (2) that the testimony was in fact about the MC 217-2 well. Response at 20, 21.

17. Plaintiffs' mischaracterize Diamond Offshore's motion. Diamond Offshore did not represent to the Court that McCaslin's testimony regarding erratic production was limited to the DC 133-2 well. Diamond explained that the DC 133-2 well was "one of several [wells] that exhibited uncharacteristically erratic production performance well before hurricane Ivan." Memorandum in Support of Motion to Strike Expert reports of Manders, Busch and Gore at 12, ¶ 22. The Memoranda introduced that evidence with the statement that "McCaslin testified that Plaintiffs experienced difficulties accounting for decreases in production from these wells in April 2004, six months before Hurricane Ivan moved through the Gulf and almost a year before the shut-in for repairs." *Id.* Thus, the testimony was plainly identified as being about one of a group of wells that had uncharacteristic production performance prior to Hurricane Ivan.

18. Contrary to Plaintiffs' argument, Response at 21, the group of wells exhibiting these erratic production characteristics included the DC 133-2 well, on which Plaintiffs' claim for lost reserves is based. The characteristics of these wells, including DC 133-2, indicates that Plaintiffs' claim for lost production is speculative at best.

---

[3] Plaintiffs complain that the Court should focus on methodology, but do not explain the methodology used by Mousselli in reaching his conclusion that the "trench" was consistent with passage of a wire rope across the ocean floor. This is because he used no methodology in reaching that conclusion. His report reflects no scientific or engineering analysis of the "trench" characteristics, and his report contains no comparison of the alleged trench with other trenches known to have been caused by wire rope or anchor chain. He conducted no tests and performed no analysis or studies that would support admission of his opinion under *Daubert*.

8

19.     More importantly, the DC 133-2 well experienced significant and increasing water incursion long before it was shut in after Hurricane Ivan. Mr. McCaslin testified:

> Q:  Okay. And here you say, "Well making water (increasing)" and was that for the same reason we have talked about before?
> A:  It was not.
> Q:  Oh, what was this for?
> A:  The—the water on the western line, **which included both King's Peak wells, the 217#2, the DC 133#2 well, the Aconcagua 305#1 and the Aconcagua 305#2 wells** are on the western line. They started seeing increasing water end of—end of February on that line. And based on our analysis, this is the well that was making the water.
> Q:  Why was it making water?
> A:  Because the aquifer had moved into the well.
> Q:  By when?
> A:  February of 2004.
> Q:  Okay. And which well was it?
> A:  Yeah, 2004. **It's the DC 133#2 well.**

McCaslin Deposition at 146:20-147:12 (emphasis added). As represented in Diamond Offshore's Motion to Strike, McCaslin testified that the company had experienced erratic production from several wells (including specifically, the MC217-2, the DC 133-2, the Aconcagua 305-1 and the Aconcagua 305-2 wells) due to the incursion of water into the reservoir. McCaslin testified that production from the UM40 reservoir in which the DC 133-2 well was completed was "very erratic" since at least July of 2004, months before Ivan passed into the Gulf, although he was unable to explain the basis. McCaslin Deposition at 148:13-19. As noted in the Motion to Strike, Plaintiffs internally estimated that it was highly unlikely that production from the DC 133-2 well would continue past March of 2005.

20.     Plaintiffs' internal projections establish unequivocally that their claim for lost production of 5 billion cubic feet (Bcf) of gas rests on speculation and is legally insufficient to support Dr. Gore's calculations. As this Court is aware, damages for lost production, like all claims for lost profits, must be established by the Plaintiff with "reasonable certainty." Where

9

the likelihood of profit is small, however, representing a mere possibility rather than a probability, courts refuse to allow recovery. Plaintiffs' pre-Ivan estimates of production indicated a "proved" case, with a high likelihood of occurring (90% likelihood), a "probable" case with a 50% likelihood of occurring, and a "possible" case that was unlikely to occur (10% probability). Both the "proved" and "probable" cases showed the DC 133-2 well ceasing production in March 2005. Only the unlikely case, with a 10% probability of occurrence, showed any production from the DC 133-2 well after March 2005. The "proved" and "probable" reserve estimates both showed production from the DC 133-2 well at an average of 18 million cubic feet per day (Mcf/day) in January 2005, 15 Mcf/day in February 2005 and only 1 Mcf/day in March 2005, with no production thereafter. That would be a total production of 1.019 Bcf of gas ((18Mcf*31) (January 2005) + (15 Mcf*28) (February 2005) + (1Mcf*31) (March 2005)), not the 6.2 Bcf on which Dr. Gore's estimate of "lost reserves" is based. Since production in excess of 1.019 Bcf of gas from the DC 133-2 well was less than 50% likely, it cannot be said to be "reasonably certain" that Plaintiffs lost 5 Bcf of gas as a result of the shut-in.

### III. CONCLUSION

21. As outlined in the Diamond Defendants' Motion to Strike, Plaintiffs "expert" testimony in this case does not rest on a reliable factual foundation or bedrock of scientific analysis and testing as required under *Daubert*. The testimony appears to be professional witness opinions masquerading as expert analyses. Under Rule 702 the Court must determine whether expert scientific testimony proffered is both reliable and relevant, and exclude testimony if it fails to meet *Daubert* standards. Plaintiffs' proposed "let the trier of fact sort it out at trial" approach has been rejected by the Supreme Court in *Daubert* and is inconsistent with the dictates of the Rules of Evidence. The Court should strike Plaintiffs' proposed expert testimony as unreliable under *Daubert*.

Respectfully submitted,

/s/ Robert E. Guidry

/s/ Anthony D. Weiner

Deborah D. Kuchler (#17013)
deb-kuchler@abbott-simses.com
Robert E. Guidry (#28064)
rguidry@abbott-simses.com
ABBOTT, SIMSES & KUCHLER, a P.L.C.
400 Lafayette St., Suite 200
New Orleans, Louisiana 70130
504\568-9393 - telephone
504\524-1933 – facsimile

and

Paul J. Dobrowski (*admitted pro hac vice*)
pjd@doblaw.com
Lee M. Larkin (*admitted pro hac vice*)
llarkin@doblaw.com
Anthony D. Weiner (*admitted pro hac vice*)
aweiner@doblaw.com
DOBROWSKI L.L.P.
1010 Lamar, Suite 1350
Houston, Texas 77002
713\659-2900 - telephone
713\659-2908 – facsimile

COUNSEL FOR DEFENDANTS
DIAMOND OFFSHORE COMPANY AND
DIAMOND OFFSHORE (TRINIDAD) L.L.C.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2008, I electronically filed a true copy of **Diamond Defendants' Reply in Support of Motion to Strike Witnesses and Motion for Summary Judgment.** All parties received notice of this filing by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Anthony D. Weiner