## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PIONEER NATURAL RESOURCES** | \* | **CIVIL ACTION** |
| **USA, INC.,** *ET AL.* | \* | |
| | \* | **NO.  05-0224** |
| **VERSUS** | \* | |
| | \* | **SECTION: "T"** |
| **DIAMOND OFFSHORE DRILLING,** | \* | |
| **INC.,** *ET AL.* | \* | **MAGISTRATE: "3"** |
| | \* | |

### SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE EXPERT WITNESSES AND FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES

MAY IT PLEASE THE COURT:

Diamond's recently-filed Reply Memorandum fails to change the nature of its two motions to strike, which are not *Daubert* motions, but are simply motions challenging the credibility of Plaintiffs' experts.  Furthermore, Diamond persists in asserting "facts" that are incorrect and misciting deposition testimony.

**A.      Have the Defendants Filed a *Daubert* Motion and How Should the Motion be Handled?**

Contrary to Diamond's suggestion, the Plaintiffs do not dispute that *Daubert* applies. Rather, they point out that Diamond has not filed a *Daubert* motion.  *Daubert* provides a means

for litigants to challenge whether expert testimony is based on a reliable methodology and whether it is relevant. *Transcontinental Gas Pipeline Corp. v. Societe D'Exploitation Section Due Solitaire*, No. 05-1295, 2007 WL 2712936, at *2 (E.D. La. Sept. 13, 2007). Diamond does neither. Instead, Diamond challenges the experts' credibility because their conclusions differ from those of Diamond's own experts. Such credibility issues are not the proper subject of *Daubert* motions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Given that Diamond's complaints do not really implicate *Daubert*, and that this lawsuit is a bench trial, the Plaintiffs have pointed that vetting Diamond's complaints at trial through cross-examination is most appropriate. *See Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury"). If the Court is inclined to take up the admissibility of any of the testimony from Plaintiffs' experts, then the Plaintiffs request an evidentiary hearing as used by this Court in prior matters. *Chandler v. R&B Falcon Inland, Inc.*, No. 00-2137, 2001 WL 839019 (E.D. La. July 23, 2001) (Porteous, J.).

**B.     Consider the Defendants' Claims in the**
**        <u>Enumerated Paragraphs of the Reply</u>**

Discussing the points raised in Diamond's numbered paragraphs shows why Diamond's arguments are misplaced.

**Paragraph 7:**     In this paragraph, Diamond argues that the Plaintiffs have not addressed Diamond's attack on the "trench," the marks on the ocean floor that lead from VK 917 – where the OCEAN AMERICA was moored – to the location of the pipeline damage and on to the west where a broken mooring line was found laying in the trench. Diamond evidently intends to rely on expert testimony to say there is no trench. First, any discussion of Diamond's trench

arguments is premature as Diamond's experts have not yet been deposed, so their opinions have not yet been challenged.  Second, the trench is a fact, not an opinion, so it is not a subject for a *Daubert* motion.  And third, the Plaintiffs have 30 hours of video footage that follows the trench from one end to the other, and the testimony of eyewitnesses who were there as the video was shot.  Consider the photographic evidence below:





## Results of ROV Survey



**Paragraph 8:** Here Diamond complains that the Plaintiffs have not challenged the metallurgical results of Diamond's expert, which they contend support the conclusion that the wire rope salvaged from the Gulf does not match the wires used by the OCEAN AMERICA. There are three quick rejoinders to that. One, Diamond's expert, George Vander Voort, did not perform hardness testing on all of the potential sources that would allow one to conclude the wire rope from the Gulf does or does not match a mooring wire from the OCEAN AMERICA.[1] Two, there are many, many characteristics of the salvaged wire that match the characteristics of the wires from the OCEAN AMERICA.[2] And three, Diamond has inexplicably failed to produce all

---

[1]      Vander Voot Deposition.  Plaintiffs will supplement with the transcript when it becomes available.

[2]      The wire rope salvaged from VK 823 is of the same configuration (6x47), size (3.5"), lay, material, and lubrication as ropes used by the OCEAN AMERICA.  Also, the configuration of "jewelry," the special hardware used to connect wire rope to anchor chain, was the same unique

of the mooring wires from the OCEAN AMERICA, including a 6x47 wire that would be of the same size and construction as the wire salvaged from VK 823.[3]  This means, of course, that Mr. Vandervoort's conclusions are incomplete.

**Paragraph 9:**  Here Diamond complains that Dr. Brown's drift model does not precisely replicate the path followed by the OCEAN AMERICA.  Unfortunately, that is not the test for admissibility.  F.R.E. 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  That standard is met by Dr. Brown's work here.  His drift model does not establish causation in and of itself; the Plaintiffs do not contend otherwise.  Rather, Dr. Brown's model corroborates the other circumstantial evidence of causation – the trench, the matching wire rope, etc. – by showing that the OCEAN AMERICA would have drifted in the direction of pipeline damage in Hurricane Ivan.  Note that Diamond has not challenged Dr. Brown's assumptions or his methodology in generating the drift model as would be required with a real *Daubert* challenge.

**Paragraph 10:**  Here Diamond mistakenly states that the Plaintiffs have failed to address Wayman Gore's damages model as compared to the "Hise model" from *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667 (5th Cir. 1996).  This is another misrepresentation.  The Plaintiffs rebutted this subject thoroughly over five pages of their Opposition.[4]  Gore's methodology is entirely appropriate and has been specifically endorsed by another federal court.  *See AGIP Petroleum Co. v. Gulf Island Fabricators*, 17 F. Supp. 2d 660, 661-62 (S.D. Tex.

---

arrangement in the mooring line salvaged from VK 823 as used by the OCEAN AMERICA.  Plaintiffs' metallurgist, Courtney Busch, will testify at trial why the hardness tests performed by Mr. Vandervoort are inconclusive.

[3]     Plaintiffs anticipate filing a Motion to Compel production of the missing wire rope.

1998).  With respect to Diamond's attack on Gore's pricing, Gore explained in deposition that he used the spot pricing for the Kings Peak wells because BP's agreement called for that pricing.[5]

**Paragraph 11:**   Diamond complains again about Capt. Manders, saying that "Nor do Plaintiffs attempt to justify Captain Manders' claim that Diamond should have tried to outrun the hurricane when he did no analysis regarding the feasibility of such a dangerous maneuver."  We do not understand this comment.   Capt. Manders submitted an expert report opining that Diamond should have diverted the OCEAN AMERICA away from VK 917 given the time existing for the rig move, the availability of towing vessels to assist in the maneuver, the relative strength and forecast of Hurricane Ivan, and the relative weakness of the rig's mooring design.  His opinion is that there was one week between the date on which Diamond towed the OCEAN AMERICA to the VK 917 site (September 8) and the forecasted and actual arrival of Hurricane Ivan at that location (September 15), which allowed more than enough time to safely divert the rig out of the path of the storm.   What "feasibility analysis" is Diamond looking for?   Calculations by Diamond's expert show that there was ample time to move the rig;[6] he simply agrees with Diamond's decision to moor the rig as planned rather than to move the rig.

**Paragraph 12 - 15:**  Here Diamond complains that the Plaintiffs are trying to ignore *Daubert*. Not so.  What the Plaintiffs have said is that Diamond has not raised a *Daubert* complaint.  These paragraphs exemplify Diamond's challenges.   Diamond complains that three of the Plaintiffs' experts have not demonstrated the basis for certain of their opinions.  That is incorrect.  The

---

[4]      Plaintiffs' Memorandum in Opposition to Diamond's Motion for Partial Summary Judgment at pp. 9-14.

[5]      Gore Deposition at pp. 61-62, pertinent pages of which are attached as Exhibit 1.

[6]      Robert Ettle Deposition at pp. 79-80, pertinent pages of which are attached as Exhibit 2.

experts' reports adequately provide the basis for the opinions.   Furthermore, Diamond has deposed each of the experts and has had the opportunity to explore this issue with each one.

**Paragraph 16 - 19:**   In these paragraphs Diamond tries to recover from its prior inaccuracies concerning the testimony of BP engineer Neal McCaslin.   But Diamond continues to state as fact its belief that the plaintiffs "experienced erratic production from several wells (including specifically, the MC217-2, the DC 133-2, the Aconcagua 305-1 and the Aconcagua 305-2 wells) due to the incursion of water into the reservoir."   This point is simply incorrect.   The testimony cited by Diamond relates to the CEPS' western flow line generally, which carried co-mingled production from several wells.   Mr. McCaslin was not testifying as to a particular well; he testified that the western flow line showed a water increase and that analysis revealed that the DC 133-2 well was the one that was making the water.   Mr. McCaslin's declaration submitted by Plaintiffs with their original opposition confirms this fact.[7]

**Paragraph 20:**   Here the Defendants point out that BP's records include several different predictions about the anticipated production for the DC 133-2 well (the one that lost recoverable reserves) and criticize expert Gore for basing his loss calculations on one of the formal in-house reserve estimates – the one relied upon by BP engineers in reporting reserves to the federal government.   Diamond argues that Gore instead should have relied on a different production forecast that BP provided to a partner.   Diamond's experts have not validated the production forecast – though they rely on it – and BP has provided evidence that the estimate "did not follow standard engineering practices."[8]   Furthermore, Gore independently verified the accuracy

---

[7]        Doc. 230-4 at ¶ 5.

[8]        Doc. 230-4 at ¶ 6.

of his reserve selection.[9]  Diamond's argument about Gore's choice of reserves is not a *Daubert* challenge, but rather a subject for cross-examination.

**C**.   **Fugro Chance Has Explained its Trench Data**

In its original memoranda in support of these motions, Diamond accused the Plaintiffs and Fugro Chance ("Chance" – a non-party to these proceedings) of "filtering" or "manipulating" the trench survey data.[10]  Therefore, at the request of Plaintiffs, Chance provided a witness to explain its data collection process during the trench investigation.  Mark Buhrke, Chance's Manager of Marine Data Management, testified by deposition on February 7.  He was the supervisor of Chance's survey analysis staff.[11]

As an initial matter, Mr. Buhrke explained that the Chance dvds of the trench show the surveyed locations of the trench.  During the trench investigation, Chance recorded the images that were being taken by the underwater ROV camera.  During this recordation, Chance stamped the video image with the time, date, and the position of the ROV in X and Y coordinates.[12] Chance produced the dvds to Diamond in December 2007, meaning that Diamond and its experts have been in possession of this evidence that clearly depicts the surveyed X and Y coordinates of the trench.  Mr. Buhrke also explained why another of Diamond's complaints was misplaced.  At some points, Chance's data indicated that the survey points were taken at a time when the ROV was out of the water.  Mr. Buhrke explained that this discrepancy was simply a function of Chance's manually importing the data from one database into a separate database.[13]  The time

---

[9]      Gore Deposition at pp. 9 -10.

[10]     Doc. 216-2 at p. 6.

[11]     Buhrke Deposition at 5-7, pertinent pages of which are attached as Exhibit 3.

[12]     Buhrke Deposition at 23-26.

[13]     Buhrke Deposition at 28-32.

stamp was simply the time the coordinates were imported into the database, not when the coordinates were taken.  The actual coordinates as depicted on the tapes are correct.[14]  These coordinates show the trench leading from the recovered mooring line in VK 823, eastward across the Plaintiffs' damaged pipelines, and then further eastward to the pre-Ivan location of the OCEAN AMERICA.

Respectfully submitted,

/s/ Mark D. Latham
Donald R. Abaunza (Bar #2273) T.A.
R. Keith Jarrett (Bar #16984)
Mark D. Latham (Bar #19673)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  (504) 581-7979
drabaunza@liskow.com
rkjarrett@liskow.com
mdlatham@liskow.com

Attorneys for Plaintiffs Pioneer Natural Resources USA, Inc., *et al*.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of February, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to all attorneys of record.  I further certify that, on the same day, I mailed, faxed, or e-mailed the foregoing document and notice of electronic filing to all attorney(s) of record who are non-CM/ECF participants.

/s/ Mark D. Latham

706611_1

---

[14]     Buhrke Deposition at 34-35.