UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PIONEER NATURAL RESOURCES USA, INC., ET AL     CIVIL ACTION

VERSUS     NO. 05-0224

DIAMOND OFFSHORE DRILLING, INC., ET AL     SECTION "B" (3)

## RULING ON OBJECTIONS AND MOTIONS IN LIMINE

**I. PLAINTIFFS' OBJECTIONS TO DIAMOND's EXHIBITS #320**

    1. **Plaintiffs' objections to Diamond's Exhibit 157, 247, 390 and 413, which defendant intends to utilize as demonstrative aids are REFERRED TO THE MERITS**. Plaintiffs shall reurge their objections to said exhibits during trial if and when Diamond offers said exhibits or attempts to utilize same as a demonstrative aid in connection with witnesses' testimony.

    2. **Plaintiffs' objections to the narratives accompanying and identifying pictures, graphs and/or tables, which are set forth in Diamond's Exhibits 162 through 202** *in globo* **and Diamond's Exhibits 224 through 231** *in globo,* **are OVERRULED**. The parties are reminded that this is a bench trial. To the extent that said narratives can be construed as a comment on the evidence and/or opinion testimony, the Court will ignore same in deciding the issues.

    3. **Plaintiffs' objections to Diamond's Exhibits 248, 364 through 373** *in globo* **are REFERRED TO THE MERITS**, **fully reserving Diamond's right to utilize or offer said exhibits at trial after laying a proper foundation**. Diamond correctly notes that, as to proposed demonstrative aids (##364 through 373), the fact that these particular exhibits may

1

contain information relevant to the damage phase does not make information contained therein which is also relevant to the issue of causation inadmissable. Plaintiffs may reurge their objections to said exhibits during trial if and when Diamond offers said exhibits or attempts to utilize same as demonstrative aids in connection with witnesses' testimony.

**II. DIAMOND DEFENDANTS' OBJECTIONS TO PLAINTIFFS' EXHIBITS**

      1. DIAGRAMS/SUMMARY CHARTS/PLOTS OF "THE TRENCH"

Defendants object to Plaintiffs' exhibits (diagrams/summary charts/plots) regarding the alleged sea floor trench purportedly extending from the Canyon Express Pipeline System ("CEPS") to the location of the *Ocean America* rig – *i.e*., Plaintiffs' Exhibits 27, 31, 85, 88, 140, 148, 153, 161, 162, 224, 240, 241, 247, 259, 270, 350, 356, 363, 364, 366 and 383-387. Defendants' objections are SUSTAINED for reasons more than sufficiently supported by the testimony of Mark Buhrke,[1] Stephen Spruell[2] and Adam Albarado.[3] The use of summary

---

[1] Mark Buhrke, the chief surveyor and manager of marine data management for Fugro Chance, testified that precision is an imperative in marine surveying. Burhke Deposition at p. 60. Burhke delegated responsibility for the survey of the Canyon Express Pipeline System but was otherwise uninvolved in the survey conducted by Fugro Chance. *Id*. at pp. 71 and 8. Burhke noted that Stephen Spruell was the party chief and Haseeb Rafeek was the senior surveyor on board the vessel, which he determined from reviewing the vessel logs and documents. Id. at p. 71. Burhke further admitted that (1) a "fix" without a date, time and location is not a "fix," (2) a spreadsheet does not contain "fixes," and (3) the times on the spreadsheet are not right. *Id*. at pp. 62, 78 and 89. Buhrke did not know when Fugro Exhibits 123-152 were created. *Id.* at p. 68. He admitted that there is "no typical trench survey" in his operations and there was no detailed scope of the work written down for this particular job. *Id.* at pp. 72 and 84.

[2] Stephen Spruell indicated, as confirmed by Fugro's logbook, that there were points in the survey where "the trench" could not be observed. Deposition of Stephen Spruell at p. 165. He further testified that there is no industry standard applicable to such a trench survey; instead, the operation was governed by orders from the project manager. *Id.* at p. 171. He further explained that the ROV actually flies over "the trench" and fixes are taken on the ROV not the

exhibits is sanctioned only when they reflect and summarize other evidence in the case which has been provided to opposing party in advance of trial on the merits. In this regard, plaintiffs have never produced the raw data coordinates for the ROV path. Indeed, plaintiffs never requested that raw data reflecting the actual alleged trench path from Fugro. Pursuant to a subpoena duces tecum issued to Fugro by Diamond, it was furnished with only four hours of raw navigation data – *i.e*., "fixes" of only a small portion of the ROV's inspection route. The fixes of the four hours of raw data which were recorded every two seconds and provided to Diamond show an irregular route that does not coincide with the straight-line "trench map" comprised of derivative data depicted on Plaintiffs' plots, spreadsheets and/or summary data. In other words,

---

trench, even where it can be observed. *Id*. at p. 174. Spruell agreed that, in places where "the trench" forked, the ROV followed only one side of the fork; he did not recall going back and investigating the other side. *Id.* at pp. 165 and 176. He further candidly admitted that he really could not say either (1) what path the ROV took from point to point or (2) what caused the indentations from point to point. *Id*. at pp. 188, 189 and 190. Additionally, Spruell admitted that he did not know how deeply the pipelines and umbilical at issue were buried beneath the mud, however, he did recall the dredging to uncover the pipelines. *Id*. at pp. 193-194. Finally, he indicated that, as to the sonar shots, they were taken by the ROV and logged; when the sonar image was captured, it was recorded by the ROV, saved in SMB format and Fugro was provided a copy of that image to add to their data. *Id*. at 201.

[3]Adam Alberado, a company representative for Deep Sea Development Services, testified that his determination that the *Ocean America* was the cause of the pipeline damage at issue in January of 2005 was based upon the fact that the trench mark ended on the leg of the *Ocean America*. Deposition of Adam Alberado at p. 58. He admittedly made no investigation to determine whether there were any other vessels that crossed the pipeline during the pertinent time frame. *Id.* at p. 60. Alberado further admitted that he was aware that the methanol line was not only damaged but had been pushed down approximately 5 to 6 feet. *Id.* at p. 62. When asked whether he believed that an anchor chain being dragged along the ocean floor could push a pipeline down 5 to 6 feet, Alberado stated that that is something that he has not had experience with. *Id.* at 63. Finally, he testified that the westward track of the trench ended at a cable which was recovered from the ocean floor. Albarado's determination that the cable recovered from ocean floor came from the *Ocean America* was based entirely upon the existence of "the trench" that extended from Leg 1 or 2 of the *Ocean America's* mooring array westward across the damaged pipelines and ended at said cable. *Id.* at p. 84-85.

the summary data does not reflect the actual "fixes" recorded along the ROV's inspection route. For all of the foregoing reasons, Diamond Defendants' Objections to Certain Exhibits, Testimony regarding said Diagrams are GRANTED.

The undersigned has considered Plaintiffs' Opposition to Defendants' Objections. The fact that Fugro issued the Trench Inspection report[4] to Total in January of 2005 is of no moment. Additionally, the Court is not persuaded by the facts that (1) Burhke of Fugro identified the "Trench Inspection report" (Plaintiffs' Exhibit 140) as Fugro's data management file on the project maintained and prepared by Fugro's analyst that reported to him and (2) that Burhke testified that same was prepared by Fugro in the normal course of its business. Diamond's argument focuses by and large on the admitted inaccuracies of the Fugro's "Trench Inspection report" and Burhke's admission that precision in a survey report is critical. Indeed, the admitted fact that Total simply plotted coordinates is telling. Turning to Burhke's allegedly "unequivocal" testimony that the trench coordinates are accurate and that Fugro did not alter, filter or manipulate data to create an impression of precision that is absent in the raw data,[5] his testimony in that vein is rebutted by his own and others' testimony discussed above. Such a data compilation and/or presentation was clearly not kept in the ordinary course of business.[6]

---

[4]*See* Plaintiff's Proposed Exhibits 85, 140 (Fugro's records), 240, 241, 259, 350 and 356-07 (DDS/Albarado's records).

[5]*See* Plaintiffs' Opposition to Defendants' Objections at pp. 5-6 [Doc. No. 326].

[6]*See* Burhke's Deposition at pp. 60, 62, 68, 78, 84 and 89 (admitting that (1) precision is an imperative in marine surveying, (2) a "fix" without a date, time and location is not a "fix," (3) a spreadsheet does not contain "fixes," (4) certain times on the spreadsheet are not right; and most importantly, (5) that there is "no typical trench survey" in his operations); Spruell's Deposition at pp. 165, 171, 174, 176, 188-190, 193-194 and 201 (admitting in the face of a "straight line" continuous trench diagram that (1) as confirmed by Fugro's logbook, there were points in the survey where "the trench" could not be observed; (2) there is no industry standard

Diamond did not object to the contemporaneously recorded video recordings allegedly showing the location of "the trench" taken approximately every twenty minutes and such is the best evidence of extent and substance of the survey conducted by Fugro at the direction of Total's project manager.

The Court recognizes that Mr. Merritt has not yet testified. Additionally, the undersigned is aware of the fact that Merritt was not tendered as an expert. Nevertheless, Merritt utilized data supplied by Fugro in its January 2005 "Trench Inspection report" and plotted various diagrams of those coordinates. Said plots/charts/graphs are offered by Plaintiffs as accurate depictions of the "*entire*" path of "the trench."[7] Nevertheless, it is undisputed that from time to time "the

---

applicable to such a trench survey; (3) the "fixes" were taken on ROV which flies over "the trench," apparently even where "the trench" could not be observed; (4) in places where "the trench" forked, the ROV followed only one side of the fork and did not go back and investigate the other side; (5) he could not say what path the ROV took from point to point or what caused the indentations from point to point; (6) he did not know how deeply the pipelines and umbilical at issue were buried beneath the mud but did recall dredging to uncover the pipelines; and (7) sonar shots recorded in SMB format was added to their data); Albarado's Deposition, who was not tendered as an expert, at pp. 58, 60, 62-63 and 84-85 (testifying that (1) his determination that the *Ocean America* was the cause of the pipeline damage at issue in January of 2005 was based upon the fact that the trench mark ended on the leg of the *Ocean America*, (2) his determination that the cable recovered came from the *Ocean America* was based on the facts that the "the trench" extended from Leg 1 or 2 of the *Ocean America's* mooring array westward across the damaged pipelines and ended at a cable recovered from the ocean floor, (3) no investigation was made to determine whether there were any other vessels that crossed the pipeline during the pertinent time frame; and (4) he was aware that the methanol line was not only damaged but had been pushed down approximately 5 to 6 feet but had no knowledge or experience upon which to base a determination that an anchor chain being dragged along the ocean floor could push a pipeline down 5 to 6 feet).

[7]*See* Plaintiffs' Opposition to Diamonds' Objections at p. 12 (noting that "Mr. Merritt plotted the *entire* trench in January 2005 after he received the Trench Inspection report from Fugro") [Doc. #326]; Plaintiffs' Memorandum in Opposition to Motion to Strike Supplemental Report of Courtney Busch at p. 334 (arguing that (1) "a trench on the sea floor lies *in a straight line* (*i.e.* on the same heading) across four CEPS lines, intersecting points of damage on each," (2) "the trench leads three miles <u>northwest</u> from the damaged lines, in a straight line, to VK 823,

trench" disappeared or could not be detected by Oceaneering's ROV and, yet, it forged ahead. It is also undisputed that, where "the trench" forked, Oceaneering's ROV only surveyed one prong of the fork and did not investigate the other prong. Therefore and to the extent that Merritt's plots are based on derivative data set forth in the Fugro's January 2005 "Trench Investigation report" and do not represent the actual path or paths of the actual trench or trenches, they are decidedly misleading and inadmissable as either proof or a rough illustration of the location and course of "the *entire* trench" allegedly extending from Leg 1 or 2 of the pre-Ivan mooring position of the *Ocean America* westward across Plaintiffs' pipelines and allegedly ending at a location on the ocean floor where a cable was recovered.

Plaintiffs will be permitted to proffer the expert testimony of Total's employee Merritt who was not engaged in the ordinary course of either Total's or Fugro's business. The "trench survey" was performed at the direction of Total sometime after surveying the damage to its pipelines and umbilical. It is clear that this post-accident investigation was not conducted in the ordinary course of business and was at all times guided by the assumption that *cable or wire recovered from the western end of the trench or trenches was one of the wire cables that moored the Ocean America immediately pre-Ivan.*

In summary and as to the charts and diagrams at issue, the Court agrees with Diamond that all of the foregoing summary charts, diagrams and/or plots as well as the testimony of their respective authors are improper for all of the foregoing reasons.

2. SONAR SHOTS

---

where a broken mooring line lays in the trench," and (3) from the four damaged CEPS pipelines, a trench on the sea floor leads thirteen miles <u>east-southeast</u> in a straight line to VK 197, where the OA was moored prior to Ivan.") (all emphasis in original) [Doc. #334].

As to the Defendants' objections regarding sonar images/shots contained in Plaintiff's Exhibits 25, 113, 125, 143, 144, 145, 146, 224, 247, 374, 394-396 and 412-438, said objections are REFERRED TO THE MERITS and shall be considered in connection with the testimony of Oceaneering's ROV supervisor, David Burtner, who will testify live at trial on the merits regarding the existence of one or more trenches crossing the CEPS lines and sonar images of same.

3. OBJECTIONS TO MISCELLANEOUS EXHIBITS REFERRED TO THE MERITS

Defendant's objections to the following exhibits are REFERRED TO THE MERITS, to wit: #33 Plat of Viosca Knoll; # 45 Inter-Office Memo dated 8/27/2008; #60 Instructions for Completion of Form CG 2692; # 79 E-Mail dated 1/1/05; #113 E-mail dated 1/1/05; # 125 E-mail dated 2/2/05; #132 Delmar Power-Point Presentation re Design and Installation Improvements; #135 Nautical Chart inscribed with a proposed vessel course for OA; #151 Courtney Busch's Handwritten Notes/Pictures/Reports; ## 170-174 and #176 Exhibits to Report of BPP Technical Services/Dr. Brown's Report and Report dated 11/20/07; ## 180-181 Dr. Courtney Busch's Photographs and Demonstrative Exhibits; #190 Summary of National Weather Service forecasts for period of 9/16/2004; ## 191 and 193 Post Mortem Failure Assessment by Sharples and Improved MODU Design Codes co-authored by Diamond's Expert Kwan; #353 Oceaneering Videos not provided prior to December 29, 2008; #357 Printouts of data discs and outtakes of videos not previously provided; #369 Summary of Ocean America Mooring Register v. Wire Rope Samples; #370 Summary of of Mooring Wire Comparison; # 372 Specimens of Wire from OA and salvaged wire; #373 Specimens of damaged Methanol Line; # 378 Excerpts from East Line ... not provided to Diamond prior to December 29, 2008; #382 Summary of OA

Rig Movement Reports; #390 Fugro Documents; # 450 Unidentified Documents not previously provided by Plaintiffs; #451 Summary of Exhibit No. 378; and #470 Demonstrative Exhibits not previously provided by Plaintiffs.

   4.  OBJECTIONS OVERRULED

Defendant's objections to the following exhibits are OVERRULED, to wit: # 103 Frank Chou article; #134 Frank Chou's article re investigation of mooring line failure; and ## 186-188 Logs of Vessels assisting OA on its move to VK-917.

   5. EXHIBITS WITHDRAWN BY PLAINTIFFS.

Defendant's objections to the following exhibits have been WITHDRAWN, to wit: # 127 Expert David Brown's Notebook; #177 Drift Model for Ocean America; #367 Summary of Diamond's Mooring Analysis; and #368 Summary of Industry.


**III. DIAMOND DEFENDANTS' SECOND MOTION IN LIMINE**

   1. Evidence of Subsequent Remedial Measures.

Diamond seeks an order in limine excluding all evidence of subsequent remedial measures generally without specific reference to any subsequent remedial measure. Plaintiffs point out that Federal Rule of Evidence 407 specifically provides that such evidence is admissible to prove for purposes of proving feasibility, inter alia. Plaintiffs further note that the purpose of the rule is to avoid providing a disincentive for a defendant to rectify a hazardous condition. In other words, concerns addressed by Rule 407 are not affected by third party actions. In this regard, both plaintiffs and defendants are referring to evidence of "an industry wide effort in conjunction with Mineral Management Services (MMS) to enhance moorings"

8

post- Hurricanes Ivan, Katrina and Rita. Diamond's generic motion in limine is improper. However, the Court notes that the defendant's more specific objections addressing the issue of subsequent remedial measures regarding Plaintiff's Exhibits ## 132 and 193 were referred to the merits. *See* Defendants' Objections to Plaintiffs' Exhibits.

    2. Kincaid's Mooring Analysis.

Diamond seeks an order excluding any evidence that Kelly Kincaid's mooring analysis was inconsistent with API RP 2SK. The thrust of defendants' objection was that it is undisputed that the Kincaid analysis was performed in anticipation of the OA utilizing 3" chain on one of the legs; all parties agree that 3" chain was never installed. Plaintiffs argue that the evidence shows that Kincaid's failed analysis was the one that Diamond relied on for deployment at VK-917. Plaintiff contends that this evidence shows that Diamond did not comply with API RP 2SK for the OA's deployment to VK-917 and it should not have done so without a satisfactory mooring plan. The Court notes that it referred defendant's objection to Defendant's Exhibit # 45 – i.e., Kincaid's mooring analysis of the OA utilizing a 3" chain – to the merits.

    3. Expert Testimony from a Witness not previously designated as an Expert.

Diamond seeks an order generally excluding evidence from any expert witness not so designated in the pretrial order. The Court agrees with plaintiffs and finds that the defendants' objection "sweeps too broadly."

    4. DeepStar Metocean Criteria.

Diamond seeks the exclusion of any evidence that the DeepStar metocean criteria that its engineers used to perform the mooring analysis for VK-917 was inappropriate. Diamond seeks to use figures generated post-Ivan by its litigation consultant (Schaudt) to argue that the data set

9

utilized turned out to be accurate. Plaintiffs point out that, even assuming that Schaudt's figures are accurate, that does not make Diamond's mooring analysis protocol appropriate. Diamond's motion in limine is DENIED insofar as it seeks to limit evidence and testimony regarding the DeepStar metocean criteria used by Diamond engineers to perform the mooring analysis for VK-917.

5. Expert Testimony Unsupported by Admissible Facts.

Diamond's request to exclude any expert opinion unsupported by admissible facts sweeps too broadly. The Court specifically reserves defendants' right, however, to object to opinion testimony at trial to the extent that it is without any basis in fact and thus not helpful to the Court.

6. Any Evidence not related to an Issue set forth in the Pretrial Order.

Diamond's request for an order in limine excluding reference to any evidence, statement or argument supporting an issue not set forth in the pretrial order also sweeps too broadly. The Court reserves the defendants' right to specifically object at trial on the merits to any evidence, statement or argument not reasonably related to an issue set forth in the pretrial order.

7. Evidence of Other Rig Break Aways.

Diamond's request for an order in advance of trial excluding any evidence that Diamond had rigs break away in "any non-Hurricane Ivan-related event" is DENIED.

8. Reference to Probable Testimony of Absent Witness.

Insofar as Diamond seeks an order in advance of trial excluding evidence or argument regarding incorporating probable testimony of a witness who is absent, unavailable or not called to testify in this case, the Court reserves defendants' right to raise that objection at trial in the

event that the situation arises.

      9. Evidence of Other Claims or Suits against Defendants.

As to evidence of other claims or suits against the Defendants, plaintiffs submit that they have no plan to elicit such testimony and thus Diamond's motion is moot in that regard.

**IV. PLAINTIFFS' MOTION IN LIMINE REGARDING DIAMOND DEFENDANTS' OBJECTIONS TO PLAINTIFFS' DESIGNATED DEPOSITION TESTIMONY # 328**

Plaintiffs seek an order in limine striking the defendants' untimely objections to plaintiff's timely designated deposition cuts. The Court's non-jury trial preparation order provides that plaintiffs' deposition cuts are due by December 5, 2008 and defendants' counter-designations and objections are due no later than December 12, 2008. Plaintiffs were not provided with the defendants' objections until December 29, 2008 – *i.e.*, too close to trial. Because the plaintiffs do not have sufficient time to respond and because the undersigned must review said deposition passages in any event, plaintiffs' motion to strike defendants' untimely objections is GRANTED.

**V. PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EXPERT GEORGE VANDER VOORT's REBUTTAL TESTIMONY/REPORT #319**

Plaintiffs complain that Vander Voort's third submission in this case, a rebuttal report, was provided only 11 days prior to trial. The report is entitled "Examination of the Knoop Microindentation Indents made by Welding Testing Laboratories for Courtney Busch to Determine Hardness Profiles in Drawn Wires from Deep Down and from Bridon UK Ropes 2 and 7 from the *Ocean America*." Plaintiffs submit that the late report and its cited "outside

11

materials" created problems scheduling Vander Voort's deposition and required Court intervention. Plaintiffs submit that this rebuttal on the eve of trial presents a hardship for the plaintiffs and that there is nothing in the rebuttal report that could not have been addressed in Vander Voort's earlier submissions.

Vander Voort went to Weld Testing Laboratory and observed Courtney Busch's samples on December 15, 2008. He concluded that the indents made by Weld Testing were invalid according to ASTM standard E384, which covers microindentation testing of metals using Vickers and Knoop indenters. For various reasons including the fact that Weld Testing utilized antiquated equipment, did not prepare the samples and did not do a hardness profile, Vander Voort concluded that the indents are invalid and the test results are meaningless.

Plaintiffs' Motion to Strike Vander Voort's rebuttal opinion is DENIED.

## VI. DEFENDANTS' MOTION TO STRIKE COURTNEY BUSCH's SUPPLEMENTAL REPORT #310 AND MOTION FOR SANCTIONS # 330

Defendants' Motion to Strike Courtney Busch's Supplemental Report is by and large reiterated within the context of Defendant's Motion for Sanctions. Essentially, defendants submit that Plaintiffs' expert changed his opinion on causation entirely from wire rope to anchor chain as the culprit, which is a violation of *Daubert* II. Defendants contend that the fact that, based on the same evidence, the expert's opinion on causation can swing from one source to another entirely different source of the damage makes his opinion as an expert unreliable and his methodology questionable. In addition, defendants note that neither the microhardness testing nor the grease sample analysis support Courtney Busch's conclusions.

The motion to strike Courtney Busch's Report and the Defendants' Motion for Sanctions

are referred to the merits, specifically reserving the defendants' right to reurge its request for the imposition of sanctions at the conclusion of trial the trial.

New Orleans, Louisiana, this 5th day of January, 2009.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**