UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PIONEER NATURAL RESOURCES, ET AL            CIVIL ACTION

VERSUS                                       NO. 05-0224

DIAMOND OFFSHORE DRILLING, INC., ET AL       SECTION "B" (3)

**WRITTEN REASONS FOR THE COURT's ORDERS
DENYING PLAINTIFFS'MOTION FOR RECONSIDERATION  #338
AND
SUSTAINING DEFENDANTS' OBJECTIONS TO CERTAIN TESTIMONY #340**

Before the Court is Plaintiffs' Motion for Reconsideration (Doc. # 338) of the Court's Ruling in Limine (Doc. #337) excluding various summary renditions of "the trench" from evidence at the trial. In this regard, plaintiffs argue that the ruling hinges on the various exhibits' "purported unreliability and conclusions unsupported by the facts." *See* Plaintiff's Motion for Reconsideration and Memorandum in Support (Doc. #338). Defendants filed a formal memorandum in opposition (Doc. # 340) and objected to certain testimony regarding the summary plots at issue. For the following reasons, the Court DENIED Plaintiffs' Motion for Reconsideration and SUSTAINED defendants' objections to certain testimony by Mr. Mousselli based upon plaintiffs' summary plots and coordinate data.

**CONTENTIONS OF PARTIES REGARDING
PLAINTIFFS' MOTION FOR RECONSIDERATION**

Plaintiffs submit that there is no evidence indicating that plaintiffs' investigation of the drag marks east and west of the damaged pipelines was guided by the assumption that the cause was one or more broken mooring lines or anchor chains trailed by the *Ocean America*, which was cast adrift during Hurricane Ivan. Plaintiffs also address the issues of "the fixes" and their

1

accuracy, straight-lining "the trench" survey so as to fill in the gaps, whether or not there was any investigation of forks in "the trench" and the absence of raw data illustrating the actual path of the ROV and/or "the trench."

Defendants contend that it is now clear that the plaintiffs concede the absence of "raw data," and that all of "the fixes" represented on the summary charts/plots are "average" fixes, which do nothing more than reflect an approximate straight-lined course of the ROV. Defendants further argue that plaintiffs' own documents demonstrate that "the trench" survey commenced with Diamond's *Ocean America* in their sights. Defendants further submit that the testimony of Burhke, Spruell and Burtner do not support plaintiffs' position that the coordinates plotted by plaintiffs' representatives fairly reflect the path of "the trench;" rather, the evidence amply demonstrates that plots are comprised of average "fixes" on the ROV that "flew" the entire course of "the trench," which plaintiffs submit ran from the damaged pipelines east to the Ocean America's pre-Ivan mooring site at Viosca Knoll and west to the site of the mooring line (called "Down Deep") recovered from the ocean floor at the western end of "the trench." Finally, defendants objected to certain testimony by Mr. Mousselli as an attempt "to backdoor coordinate data" previously excluded by the Court.[1]

**ANALYSIS**

The Court recognizes that plaintiffs discovered and recovered the wire at "the end" of the ROV's westward track which occurred *after* discovery of the damage to the CEPS pipelines and *after* the ROV's eastward track to the Ocean America's pre-Ivan mooring site. Nevertheless, it

---

[1]As previously noted at the outset, insofar as the defendant's opposition does double duty of as the Motion to Exclude Certain Testimony of Dr. Mousselli# 340, the aforesaid Motion #340 is DISMISSED AS MOOT in light of Plaintiffs' Response # 342.

is clear from the evidence in this case that once damages to plaintiffs' pipelines were discovered, their investigation proceeded with the assumption that *Ocean America* was the cause of the harm.  Email correspondence from Total's Richard Case addressed to Adam Albarado of Deep Sea Development Services (the company hired by Oceaneering to scope the drag marks east and west of the damaged pipelines), instructed at the outset of the investigation, as follows:

> Attached is a chart of the Canyon Express System in the VK area with some of the platforms and rig locations at the time of Hurricane Ivan.  Please use this map as a reference in collecting your tracking/investigation data.  The current plan for the Ocean Service is: (not necessarily in this order - use your judgment in which is the most efficient steps to complete.)
>     1 - complete the Oceaneering crew change
>     2 - continue the investigation of the Eastwardly trench track - if you check the map attached, *we are estimating that this trench will lead you to the drilling rig - "Ocean America" location.*  If it does, please use high res sonar to shoot photos in a 360 degree circle to see if you can identify an old anchor pattern.  Any information/coordinates of holes/depressions or actual signs of anchor locations would be good.
>     - if you cross any other company's pipeline and see any damages, perform an adequate non-intrusive survey investigation and record as much data as possible so that we can share that with the owner of the pipeline."[2]

Steven Spruell of Fugro Chance ("Fugro"), who was "party chief" of the subject

---

[2]Email from Richard Case to Adam Albarado dated 1/7/05 (italicized emphasis added) [Plaintiff's Trial Exhibit "80"/Exhibit No. 128 to Albarado's Deposition provided to the Court prior to the commencement of the trial); *see also* Email from Andy Jeffries of Deep Sea to Adam Albarado dated 1/8/05 (stating that it "seems probable that when the *O[cean] A[merica]* broke loose of its mooring the line that was connected to the pile that is 500 ft away touched down at the beginning of the trench and then was dragged westward across the CE system" and that "we should check with Diamond to determine which leg that was and where it broke").  *See also* DSDS Job Log Summary for Client Total (Job No. 65510) (noting on 1/8/2005 at 8:17 A.M. "[a]rrived at end of trench where drill rig *Ocean America* was positioned during Hurricane Ivan" and "[t]aking sonar shots for where drag marks *might* have started") (italicized emphasis added) [Plaintiffs' Exhibit 440-0005].  *See also* Trial Testimony of Richard Case dated January 8, 2009 (indicating that as of January 7, 2006, Total was estimating that the trench would lead to the Ocean America, that this estimation or assumption was based on internal discussions and that Total was aware that there were three other vessels in the area but that he had no knowledge as to whether Total ever investigated the details regarding other vessels in the area).

investigation, admitted that he had heard speculation that *Ocean America* may have caused the drag marks, to wit:

> Q. During the course of the survey investigation, when did you – when, if ever, did you come to hear about a Diamond rig known as the *Ocean America*?
> A. There was some discussion in the galley, just conversational talk.
> Q. And what was the nature of the conversation?
> A. I heard it was speculated that they had been blown off [location] by a storm of some type and it may have caused the drag.[3]

Now turning to the issues of gaps or disappearance of the "drag marks" or "the trench," accuracy of "the fixes," and/or "straight-lining" Fugro's data, the following passages of Spruell's testimony are telling, to wit:

> Q. Before you reviewed the logbook and the daily progress reports, what was your memory with respect to this survey?
> A. I remember that we were sent out to – the focus of the job was to detect a leak, and we found a trench. And we followed it in one direction, and it petered out, came back to the leak and followed the other direction and it petered out. And that's the crux of it.[4]

Spruell further testified as follows:

> Q. What would – if you recall, what would you guys do when you were following the trench and you would lose it?
> Mr. Latham: I object to the form.
> A. The ROV would take action to either find it, relocate it or they would make the decision to abandon it, I wouldn't have any say in that decision.[5]

He again admitted:

> Q. There were points during this trench survey where you couldn't see the trench anymore?
> Mr. Latham: I object to the form.
> A. That's, yes, in the logbook.

---

[3]Deposition of Steven Spruell at p. 154; *see id.*, at p. 190 (same).

[4]*Id.* at p. 148.

[5]*Id.* at p. 156.

4

***
Q. Is there any notation in your – do you have any memory of sonar being used in any form other than stationary shots being taken?
A   The only recollection I have is when we read the logbook today and I made a note or Haseeb made a note that they were using sonar because they couldn't visibly see the pipeline or the gouge, whatever.  But as far as when they used it, I don't – I couldn't tell you that.[6]

Directly addressing the issue of reliability and, more to point, whether plots, diagrams and/or summary charts illustrate the path of  "the trench" or simply the course of the ROV, the Court found the following passages of Spruell's deposition particularly enlightening:

Q.  Well, for example, if you are going to do a pipeline survey, you want to make sure that you don't miss any of it.  So, if you leave, you got to know where you left and you got to come right back to there.
A.  On a pipeline, usually what you do is you'd use some overlaps to make sure you're getting everything.  But the pipeline is a physical structure on the seabed.  The ROV can find it.
Q.  So that is what you did in this case, you overlapped?
Mr. Latham: Objection to the form.
A.  This wasn't a pipeline survey.  We took a fix.  We directed – not directed.  We provided the ROV with the position, a range, an azimuth to that position, and they got to it the best way they could ....
***
Q.  You're calling the whole thing a trench survey.  You're not saying at every single  – every point you could visibly identify a trench?
Mr. Latham: I object to the form.
Q.  Because some places you couldn't see it?
Mr. Latham: Same objection.
Q. (By Mr. Weiner) Okay.  Let me –
Mr. Latham: I'm not sure he was finished.
A.  No.  We referred to it as a trench.
Q. (By Mr. Weiner) During a pipeline survey, sometimes you can't see the pipeline. Right?
A.  Yes.
Q.   But you still call the whole thing a pipeline survey?
A.  Yes.
Q.  And when you are – are you referring to a trench survey in the same vein, the whole thing a trench survey?

---

[6]Spruell Deposition at pp. 165 and 184.

Mr. MacKillop: I object to the form.
A. Yes.[7]

Indeed, Spruell candidly stated: "We're representing the path that the ROV took."[8] He further indicated that he was not aware of any industry standard or protocol regulating the performance of a trench survey; rather, Spruell followed the directions of the project manager.[9] Spruell's instructions from the project manager were reiterated in his email correspondence, which states: "I have been instructed by the client that we will be following the trench until we find 'something.'"[10]

At the outset, defense counsel agreed to withdraw his objections to the summary charts and plots at issue if they were more accurately characterized as average "fixes" on the ROV and thus the path that the ROV took over the CEPS surveying damaged pipelines and then "the trench." Plaintiffs refused to agree to any such re-characterization of the summary plots insisting that the coordinates mapped the path of "the trench" itself.

Now addressing plaintiffs' contention that the trench was always detected visually by the ROV or by sonar (looking 300 feet ahead) when the trench faded or disappeared, actual video footage presented at trial does not support that argument. Certain visuals of "the trench" viewed in Court showed no furrow whatsoever; nevertheless, various representatives of plaintiffs and their contractors identified "the trench" despite its disappearance on the video display. "The

---

[7]*Id.* at pp. 160, 165-166.

[8]*Id.* at p. 174.

[9]*Id.* at p. 171.

[10]*Id.* at p. 208-209.

trench" featured on the ROV video display was at various instances a virtual chameleon.[11]

For all of the above and foregoing reasons, in addition to those previously set forth in the ruling *in limine* #337 (which is incorporated herein by reference), this Court is not persuaded that its prior order is erroneous. "The fixes" were taken on the ROV and not on "the trench," which forked, faded and completely disappeared from time to time. The best evidence of "drag marks" or "the trench" and the respective course or courses of such features is the ROV video which was admitted as evidence without objection. The summary charts, plots and "the fixes" which were taken on the ROV are not fairly representative of the course of "the trench," which allegedly ran from the pre-Hurricane Ivan position of the *Ocean America* in VK-917 westward across the CEPS and allegedly ending at the position of the cable or wire recovered from the sea floor. Accordingly, the Court issued the following orders, to wit:

**IT IS ORDERED** that Plaintiffs' Motion for Reconsideration #338 is DENIED and Defendants' Objections to Certain Testimony of Mr. Mousselli regarding excluded summary plots and charts are SUSTAINED.[12]

New Orleans, Louisiana this **6th** day of July, 2009.

---

[11]*See* Trial Testimony of Adam Albarado on January 7, 2009 on cross-examination in connection with screen shots from the video of "the trench"); Trial Testimony of David Burtner taken on January 7, 2009 in connection with screen shot videos of "the trench," Defendants' Exhibits 108, 436 and 437. *See also* DSDS Field Service Report dated January 7, 2005 (at 00:36 A.M. noting "[f]ly sub from SMDL line out eastward following drag mark area, take periodic survey fixes and use hi-res sonar for tracking and navigation," "take survey fix's every 25-ft" and then noting on the same date at 00:50 that the sub was "[u]nable to use hi-res sonar to track drag mark," "[s]onar unable to keep up in tune with sub speed," and "[u]se sub's lo-resolution to track drag mark") [Plaintiffs' Exhibit 446-0002].

[12]The aforesaid testimony regarding summary plots and charts was submitted as a proffer.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**