**PIONEER NATURAL RESOURCES USA, INC., ET AL**          CIVIL ACTION

**VERSUS**          NO.  05-0224

**DIAMOND OFFSHORE COMPANY, ET AL**          SECTION MAG (3)
          28 U.S.C. § 636( c)

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

This action arises out of events surrounding Hurricane Ivan, which occurred during September, 2004.  Hurricane Ivan caused substantial damage to numerous vessels and facilities stationed or installed in the Gulf of Mexico.  The focus of the January, 2009 bench trial conducted by the undersigned Magistrate Judge was fault/causation of the damages allegedly sustained by the plaintiffs' subsea pipeline and the merits of defendants' "Act of God" defense.

## I. BACKGROUND

On January 26, 2005, plaintiffs, Pioneer Natural Resources USA, Inc., Marathon Oil Company, Nippon Oil Exploration U.S.A. Limited, Total E&P USA, Inc., BP Exploration & Production, Inc. and Marubeni Oil & Gas (USA), Inc. (collectively "Pioneer"), filed the instant suit against semi-submersible OCEAN AMERICA RIG *in rem*, Diamond Offshore (Trinidad), LLC, and Diamond Offshore Company (collectively "Diamond").  Pioneer sued for damages to its sub-sea pipeline system allegedly caused by Diamond's rig OCEAN AMERICA on or about September 15, 2004, when it was unleashed from its moorings at Viosca Knoll Block 917 (VK-

917) and cast adrift by the force of Hurricane Ivan.

In September of 2004, the Pioneer Plaintiffs were the co-owners of the Canyon Express Pipeline System ("CEPS") located in the Gulf of Mexico off of the coast of Louisiana. The Diamond Defendants are the owners and operators of the semi-submersible drilling rig, OCEAN AMERICA ("OA"), which was cast adrift in the wake of the hurricane forces associated with Hurricane Ivan.

Pioneer alleges that, as the rig drifted with its anchor wire and chain dragging the sea floor, the anchor chain/wire assembly crossed the Canyon Express Pipeline System (CEPS), damaging various components, including a 2-7/8 inch methanol pipeline and the umbilical, both of which were located in Viosca Knoll Block 825. Plaintiffs contend that as a result of the OA anchor wire's or cable's impact, its methanol pipeline later ruptured preventing production from a number of fields. Albeit not the subject of this bifurcated proceeding, Pioneer seeks recovery of damages, including repair costs, monitoring expenses, lost production and revenues.

Pioneer's allegations of fault are both negligence and unseaworthiness in a number of particulars, including that the rig was improperly moored so that it could not withstand the anticipated storm and that the rig was placed in an unsafe location considering the projected path of the storm. Plaintiffs challenge (1) whether Diamond violated industry standards in deploying its rig OA to Viosca Knoll Block 917 ("VK-917") and (2) whether defendants took reasonable precautions to minimize consequences of a mooring failure by ensuring that the OA's mooring lines would not drag the sea floor if unleashed by foreseeable hurricane force winds.

Diamond denies that its rig OCEAN AMERICA caused the damage in question. Defendants further contend that the damages to Pioneer's subsea pipeline system were caused by

a classic "Act of God" – *i.e.*, Hurricane Ivan. Diamond notes that, at the time in question, the OA was moored on the northeast quadrant of the hurricane and, when its moorings parted, the storm met or exceeded 100-year storm conditions. Defendants further submit that the OA was one of at least 5 offshore drilling rigs that lost station during the passage of Hurricane Ivan. Diamond contends that there is no evidence of a so-called "trench" cut by OA's mooring line or anchor cable in September, 2004 leading from its mooring site at VK-917 to the damaged section of Pioneer's CEPS and beyond. Moreover, defendants submit that the evidence reveals that, when OA was recovered, all eight of its mooring lines had parted at or near the fair leads.

Diamond contends that the evidence demonstrates that plaintiff's theory of causation – *i.e.*, that a single mooring line parted at the anchor chain and dragged over 8,000 feet of anchor chain and wire rope drifting in a straight line from its mooring site west-northwest over the CEPS, damaging the buried pipelines – is speculative at best. Finally, defendants argue that the evidence amply demonstrates that the "trench" could not have possibly been created by the passage of an anchor chain and wire during Hurricane Ivan. In this regard, the defendants highlight that videos of the sea floor disturbance taken within four months after the storm show mature forms of sessile sea life including sea anemones, tube worms, sponges and coral (which take years to form) attached to the bottom of the purported "trench."

The Court conducted a bench trial over a two-week period commencing on January 6, 2009. Plaintiffs and defendants presented the testimony of a number witnesses, including but not limited to live testimony from the following individuals, to wit:

(1) Kevin George Hannaford -

Total's Vice-President for Columbia and Trinidad who, in September of 2004, had overall operational responsibility for the CEPS, *inter alia*;

(2) Robert W. Merritt -

Total's Exploration Department's Database/Files Manager, who in January of 2005 became involved in the creation of maps, plots and charts of the "trench"based on coordinates provided by Fugro employees' logbooks;

(3) Adam Albarado -

Deep Sea Development Services' inspector, who, at the direction of Total's Richard Case, performed repair work on the damaged pipeline and then was later engaged in performing investigatory work utilizing low resolution sonar for most of the trek, first, from the location of the damaged lines following "drag marks," disturbed floor and other features on the sea bed on a path leading eastward back to the pre-Ivan location of the OCEAN AMERICA and, thereafter, from the location of the damaged lines leading westward to the location of a wire rope ("Deep Down") uncovered about 3.38 nautical miles west of the west Canyon Express flowline;

(4) David Burtner -

Oceaneering's ROV Superintendent in January of 2005, who (1) observed the wire brush buffing operation necessary to remove the coating on the damaged methanol (MDL)line so that the installation of a clamp would seal the split pipeline and (2) monitored ROV operations during the "trench" survey;

(5) Bryce Gerrits -

INTEC Subsea Engineer who was involved initially in the construction and installation phase of plaintiffs' subsea production system, later became involved in providing operational support and troubleshooting communications problems caused by the damaged umbilical line post-Ivan and then became involved in Total's recovery the "Deep Down" wire and Total's attempt to retrieve the anchor chain;

(6) Richard Case -

Total's Maintenance Superintendent for the CEPS, who was involved in procuring and providing logistical support (a contractor with an ROV vessel) for post-Ivan inspection for debris and damage to the pipeline system;

(7) Dr. Al H. Mousselli -

Plaintiffs' expert in the field of offshore engineering and construction, who testified that (1) his review of the DVD inspections and Oceaneering videos revealed a trench that extended over 18 miles from VK-823 crossing the CEPS into VK-917, (2) there is a correlation with the damages observed to the four pipelines that comprise the CEPS in

that the damage is consistent with a mooring line being dragged along the bottom, (3) the facts that the wire rope and chain ("Deep Down") were found at VK-823 northwest of the CEPs at the end of the trench, the damage to the flowlines appeared to have occurred going east to west and that the damage was of a size consistent with the anchor chain link dimensions support his conclusions and (4) it was reasonable for Total to commission the ROV survey of the entire pipeline to comply with the Department of Interior's "no later than date," then follow up with the ROV survey of the OCEAN STAR's crossing and to delay investigating targets identified by Intec's October 29, 2004 survey report because the lines maintained pressure integrity upon start up post-Ivan;

(8) Courtney Busch -

Plaintiffs' expert mechanical and metallurgical engineer who testified that (1) he retracted his first opinion that the passage of the anchor wire caused damage to one of the subsea pipelines and then supplemented his opinion and testified that an anchor chain caused the flattened areas of the pipe and that the superimposed striations were caused by Oceaneering's wire brushing operation on the damaged section of methanol pipeline and not individual wires of a wire rope, (2) the final failure of pipe was due to both fatigue cracks in the pipe wall and ductile overloading – *i.e.*, the fatigue cracks in the pipe wall linked up as the pipe thickness was diminished by a series of five or six pressure spikes in the line and (3) based upon physical characteristics of the wire ropes, the recovered wire ("Deep Down") northwest of the CEPS could not be distinguished from the lengths of broken wire which came from legs 2 or 7 of the OA;

(9) David Brown -

Plaintiffs' expert in naval architecture and ocean engineering with particular expertise in mooring design and analysis, modeling floating structures and seabed assessment who opined that (1) prior to Hurricane Ivan the OA was noncompliant with API 2I specifications for wire rope inspections, *inter alia*, (2) Diamond compromised the failsafe design (*i.e.*, that wire part/fail under stress at or near the fair leads) and (3) based upon his drift model and other information the "trench" was caused by one of the OA's mooring lines dragging an anchor chain across the CEPS;

(10) Girish Kumar Malani -

Plaintiffs' expert in testing of metallography materials, who (1) performed manual Knoop hardness testing on wire samples prepared by Courtney Busch, (2) provided the hardness testing results to Dr. Busch and (3) testified consistent with Dr. Busch that because of variations in the wire due to different processes, the hardness profile of wire rope is not a good indicator as to whether the recovered wire ("Deep Down") matched the anchor wire from any leg of the OA while moored at VK-917;

(11) George Vander Voort -

Defendants' expert in the fields of metallography, metallurgy, fractography and failure analysis, who testified that (1) Oceaneering's January 6, 2005 Weiler brushing/ grinding process and the January 9, 2005 clamping operation compressed the shear lip of the fracture and otherwise damaged SMDL ("methanol line") thereby creating false information and making it difficult to determine probable cause of the failure, (2) the passage of 4,000 feet of anchor chain would have pulverized the methanol pipe, (3) "over pressurization" of the buried line caused the rupture from the inner diameter to the outer diameter of the pipe, forming massive shear lips pointing outward and (4) the wires on the OA do not match the wire recovered from the seabed at VK-843 for a number of reasons including differences in zinc coating and the hardness profile;

(12) Capt. Radu Victor Ionescu -

Defendants' master mariner in charge of Odyssey-class semi-submersible drilling rigs, Ocean America and the Valiant, for approximately 18 years, who testified about (1) the Ocean America's actual moorings, inspections thereof, mooring procedures and the mooring pattern for the Ocean America at VK-917, (2) the procedures of securing and evacuating such rigs as opposed to movement of same in anticipation of a storm and (3) the Ocean America's ability to be moored in compliance with API RP 2SK with respect to a ten-year storm, and the condition of the anchor wires, *inter alia*;

(13) Kenneth Joseph Schaudt -

Defendants' expert in the areas of oceanography, meteorology, metocean analysis and in determining the appropriate design criteria for a location and supplying corresponding metocean data and applying same to design criteria for floating structures in the Gulf of Mexico, who testified that (1) it was appropriate to utilize the DeepStar II 10-year criteria to do a mooring analysis for Ocean America in VK-917 in 2004, (2) before the rig moved the forecast for Hurricane Ivan was that it would affect the east coast of Florida and up until September 12, 2004 the forecast was landfall over the panhandle of Florida, (3) on September 15, 2004 at approximately 2200 the VK-917 mooring location experienced in excess of 500-year wave heights and 100-year wind speeds;

(14) Chi-Tat Thomas Kwan

Defendants' expert in mooring design and analysis for floating structures, for inspection and hardware for semi-submersibles and with respect to API RP 2SK (specifications for mooring design and analysis) and API RP 2I (specifications for mooring inspection), who testified that (1) he employed a dynamic analysis utilizing Schaudt's site specific information (DeepStar high wind, DeepStar II high wave and high current), (2) Ocean America's mooring design at VK-9-17 met or exceeded industry standards and (3) in the face of the significant hurricane force of Ivan, the Ocean America's mooring failure/drift was inevitable;

(15) Capt. Robert Ettle -

Defendants' expert in the fields of marine operations and safety, who testified that (1) the September 8th, 2004 move of the OA from VK-962 and relocation two miles away at VK-917 as planned was consistent with the Tropical Contingency Plan, standard industry practice and appropriate under the circumstances, (2) a hurricane evasion tow prior to or at the time of Ivan's entrance into the Gulf would be inconsistent with industry practice and common sense because of the risk to personnel aboard attending vessels and the OA, considering the MODU's slower speed as compared to Hurricane Ivan's eight to twenty knots, and (3) industry policy and practice in the Gulf of Mexico and throughout the world is to place greater priority on life and prevention of personal injury as opposed to property, including mobile drilling units and offshore wells;

(16) Ian MacDonald -

Defendants' expert in the fields of sea floor surveys, including the drift camera systems, ROVs and human occupied submersibles, the use of navigation data in sea floor surveys, oceanography, including marine geology and the characteristics of the Gulf of Mexico sediment, its suspension and deposit, who testified that (1) sea floor features characterized by plaintiffs as a continuous "trench" extending from VK-823 to VK-917 is actually the path the ROV drove and not the path of any one continuous feature, (2) based upon the great variation in the appearance of and the apparent age and formation time of the various disturbance features, most were not made on or about September 15, 2004 and were not the result of the single passage of a linear chain, (3) it is implausible that sessile life forms, including the delicate but large Venus flytrap anemone positioned on a piece of partially buried sheet metal located in the middle of "the trench," "the crab house" in-filled with mobile sediment and a large colony of tubeworms with a growth rate of less than a centimeter per year, would survive the passage of a 300,000 pound chain, (4) it is more likely than not that said life forms would have been pulverized and "swept out" by such an event, (5) the video survey of the "trench" does not support plaintiff's conclusion that it was dug approximately 117 days prior to the ROV survey by the passage of a 300,000 pound linear chain and (6) at the outset, those directing the ROV survey proceeded on the assumption that the "trench" would lead back to OA's pre-Ivan mooring site at VK-917.

In addition to testimonial and documentary evidence adduced at trial, the Court reviewed

the deposition testimony Mark Buhrke (Fugro-Chance's Chief Surveyor and Manager of Marine

Data Management), Stephen Spruell (Fugro-Chance's Survey Technician), David Webb

(Diamond's Head of Technical Services), David Taberner (Total's Inspection Specialist), Lyndol

Dew (Diamond's Senior Vice President of Worldwide Operations), Capt. Ian Roberts (Diamond Marine's Superintendent), Capt. Tom Visentin (former Diamond Superintendent), Frank Chou (Naval Architect/Consultant for Diamond in 2004), Floyd Joseph Friloux, Jr. (Lubricant Analyst/Consultant for Plaintiffs), Bryce Gerrits (Naval Architect/Total's Company Representative), Kelly Kincaid (Naval Architect for Diamond), Malcolm Sharple (Diamond's Engineering Consultant) and Dr. William Schroeder (Diamond's Expert - who consulted with Dr. MacDonald and reviewed video survey data regarding anthropogenic/man-made impacts at the southwest corner of VK-826, *inter alia*). Having considered the aforesaid evidence, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[1]

### Hurricane Ivan - A Catastrophic Weather Event

Hurricane Ivan created conditions far in excess of those for which mooring systems of semi-submersible rigs were designed. Two post-mortem reports indicate that the storm was such that a rig moored to 5, 10, or even 100-year storm standards would be expected to lose station under the conditions generated by Ivan.[2] Dr. Sharple observed that of the five semi-

---

[1]Factual findings that may represent conclusions of law are adopted as conclusions of law and vice versa.

[2]Dr. Malcolm Sharple's Post-Mortem Failure Assessment dated September, 2004 prepared for Mineral Management Services at pp. 19, 25 (MMS)(noting that (1) "it has been reported (Ref. 6), that Ivan was said to be a 1/2500-year storm for wave heights and a 1/700 storm for windspeeds," and (2) in each case, MODUs whose moorings broke the 100-year windspeeds were exceeded and "[i]f this was not sufficient, the additional load from increased currents would have strained the moorings beyond breaking") [Plaintiffs' Exh. 61]; Tein's Assessment re NJT prepared for BP at pp. 7, 8 (concluding that Ivan clearly exceeded the DeepStar 100-year hurricane and therefore significantly exceeded the DeepStar 10-year hurricane); Kwan, 1/13/09 P.M./Vol. VI at p. 105 (considering the huge wind speeds, wave heights and current and concluding that a mooring failure is no surprise at all and that it is a

8

submersibles impacted by the storm, the OA's location experienced the worst conditions, to wit:

> It should be noted that the wind speed, and thus the forces on the moorings of Ocean America were higher than those of any other semi-submersible in the path of the storm and exceeded those which would have been appropriate even for a 100-year design condition. This may also be a higher wind speed than has been experienced by any other semi-submersibles for Andrew, Lili or Ivan or other past hurricanes.
>
> * * *
>
> Table 4 shows the data compared to 100 year design conditions and it shows that those conditions were exceeded.[3]

Dr. Sharple's report discusses the mooring design of the five semi-submersibles that broke loose, including that of the OA, which was located east of the storm track and close to the eye wall. It is undisputed that any rig moored to either 5, 10, or 100-year standards at the OA's mooring site would have lost station.[4] The most severe quadrant of Hurricane Ivan – the northeast quadrant – passed over the Ocean America at the VK-917 mooring site.[5]

Hurricane Ivan was a storm of unprecedented magnitude and defendants could not have foreseen that it would generate the aforesaid extreme conditions at VK-917. The OA moved less than two miles to that location on September 6, 2004, a move that had been planned for some time.

> Ivan was declared a Tropical Storm on September 3. Ivan continued on a generally westward motion south of 10°N latitude and steadily strengthened,

---

surprise that the rig survived).

[3]*Id*., at p. 30.

[4]Summary Chart: Ivan Winds/Waves (At 2130 on September 15, 2004, OA's mooring site at VK-917 experienced 500-year waves and 200-year winds) [Defendants' Exh. 151]; Wind, Wave and Current Time History at Ocean America Site [Defendants' Exh. 154]; Trial Testimony of Kenneth Schaudt, 1/13/09 P.M./Vol. VI at p. 28.

[5]Schaudt, 1/13/09 P.M./Vol. VI, at p. 26. *See also* Brown, 1/9/09 P.M./Vol. IV, at p. 139 (agreeing that the 10-year weather conditions were exceeded at VK-917).

becoming a hurricane on the 5th of September centered about 1000 n. mi east of Tobago in the southern Windward Islands. It intensified a short period of time reaching its first peak intensity of 115 kts on 6 September. This made Ivan the southernmost major hurricane on record. Reports from the aircrew indicated that Ivan had strengthened to a strong category 3 (SSHS) as the center passed about 6 n. mi. south southwest of Grenada. The eye diameter at that time was about 10 n. mi. and the strongest winds raked the southern portion of the island.

After passing Grenada, Ivan reached peak intensity – 140 kts and category 5 strength (SSHS) – by 6 am on the 9th of September. As Ivan passed south of Jamaica it weakened to a category 4 strength but later intensified to category 5 strength a second time. Ivan reached its third peak intensity at 1800 UTC 11 September. However, Ivan only maintained its maximum intensity of 145 kts and category 5 status for about 6 hours before it weakened back to a category 4 hurricane on 12 September.[6]

Before the OA moved at 11:00 a.m. on September 6, 2004, the forecast was that this storm would affect Florida or the east coast of Florida.[7] On September the 6th the general trend forecast was pulling to the west; but, at 5:00 a.m. on the 7th it shifted back to the east.[8] Then, at 11:00 a.m. on September 7th, the track moved back west, but by 11:00 p.m., it turned back towards Florida and the forecast was landfall on the west coast of Florida. Suffice it to say, there was an 85% chance that the Ocean America would be on the east side – *i.e.*, the good side of the storm. As late as 5:00 p.m. on September 11, 2004 the forecast was landfall on the Florida panhandle.[9]

Not until September 13, 2004 did the storm track shift west as it approached the Gulf of Mexico, however, with the probability that the OA would remain on the weak side of the storm.

---

[6]Tein's Post-Mortem Failure Assessment at Section 5.0 General Hurricane Information at p. 14 (Plaintiffs' Exh. 61),

[7]Schaudt, 1/13/09 P.M./Vol. VI, at p. 37.

[8]*Id.,* at 37-38.

[9]*Id.,* at pp. 39-40.

After Ivan entered the Gulf on September 14, 2004, the storm track came very close to the OA site and Ivan was moving at 15 to 20 knots.[10]  The forecast was that it would increase speed as it moved north. On September 15, 2004, at 4:00 a.m. the forecast was for it to move over the OA's site and at 10:00 p.m. and that did, in fact, occur.[11]

The storm track prior to September 6, 2004 did not place the OA's mooring site (VK-917) in the probable cone of danger; by September 13 and 14 – when the storm track shifted to the west – Diamond secured the rig, slacked the lines and evacuated personnel.[12]  Similarly, Plaintiffs' Canyon Express was "shut-in" as of noon on September 13, 2004.[13]

Capt. Ettles testified that he considered the idea of a hurricane evasion tow of the OA in violation of the Tropical Contingency Plan to be a dangerous maneuver.  He explained that it would entail undertaking the risk of having rig personnel *and attending vessels* caught or trapped by the approaching storm.  In his view, that would be "a foolish plan."[14]  Remaining moored in

---

[10]By comparison and even with assistance, the maximum speed of the OA is two or three knots.  *See* Ionescu, 1/13/09 A.M./Vol. VI, at p. 50.  OA could not reasonably have been expected to outrun Hurricane Ivan.

[11]Schaudt, 1/13/09 P.M./Vol. VI, at p. 41.  *See also* National Weather Service - Ivan Graphics [Plaintiffs' Exh. 138].

[12]Ettles, 1/14/09 A.M./Vol. VII, at pp. 57-60; Ionescu, 1/13/09 A.M./ Vol. VI at p. 47 (Capt. Ionescu believed that he and Diamond had reasonably and prudently prepared for the approach of Hurricane Ivan in September of 2004).

[13]Hannaford, 1/6/09 P.M./Vol. I, at pp. 84-85. *See also* Email Correspondence re Canyon Express Shut-In dated September 13, 2004 (stating that Canyon Express is shut-in as of noon today, Canyon Station Platform secured and should be evacuated by the afternoon and power was left on with diesel generator online with enough fuel to run for a week) [Defendants' Exh. 252].

[14]Ettles, 1/14/09 A.M./Vol. VII, at p. 58-59, 61 (explaining in painstaking detail why propulsion on any vessel is problematic as the weather deteriorates and all of the risks which may attend a violation of industry policy).

accordance with the Tropical Contingency Plan – as the OA did – assumes no such risks, because the rig was evacuated and attending vessels were released to seek sheltered waters.[15]

As to the rig's two mile move to VK-917 on September 6, 2004, Capt. Ettles credibly testified as follows:

> Once you started your mobilization and you are under threat of a hurricane, you would be obliged to go to your next planned mooring site for which extensive research had been done to safely moor the vessel there. And, if you are unable to do that, you would be obliged to go to an alternate closer safe mooring site.
>
> But in this case, the planned site for mooring was less than two miles away. So it was clearly the best thing to go directly there and moor up and be prepared to evacuate.
>
> * * *
>
> [I]n my opinion they [meaning OA] did [meaning did have enough time to move from VK-962 to 917 safely, then moor, then evacuate its personnel]. You would need to allow a little time for contingency and problems, of which they did have two problems. But, even with that, they had over a day to conduct preliminary operations on the preparation of the well before they started their hurricane evacuation preparations in earnest.[16]

The Court finds no negligence in either Diamond having (1) executed the planned relocation of the rig OA less than two miles away at VK-917 on September 6, 2004 or (2) followed the Tropical Contingency Plan, instead of attempting a hurricane evasion tow upon Hurricane Ivan's entry into the Gulf of Mexico as suggested by plaintiffs.

**The Canyon Express Pipeline System ("CEPS")[17]**

The CEPS is a 57-mile long pipeline gathering system in the Gulf of Mexico offshore Louisiana. It consists of two 12-inch gas flowlines, a 6-inch electro-hydraulic umbilical control

---

[15]*Id.,* at p. 60.

[16]*Id.*, at 62-63.

[17]Overview of the System - Canyon Express - CEPS (Plaintiffs' Exh. 2).

line and a 2-7/8-inch methanol distribution line (MDL).[18]  The CEPS is comprised of three fields, to wit: (1) Camden Hills (two wells, MC 348-1 and 2) operated by Marathon with partners, Total and Pioneer; (2) Aconcagua (four wells, 305-1 through 4) operated by Total and partners Pioneer and Nippon; and (3) Kings Peak (three wells, 217-1, 217-2 and 133-2) operated by BP and partner Marubeni.[19]  All of the aforesaid wells produced through a "tie back" – *i.e.*, the two 12" gas lines (east and west) flowed back 57 miles to the fixed platform Canyon Station, which was situated in approximately 500 feet of water.[20]  At all pertinent times, plaintiffs owned the CEPS in varying percentages and TOTAL was the designated operator.[21]  The CEPS became operational in late November of 2002.[22]

   The two 12-inch flowlines (gas lines depicted as the east and west lines) transport hydrocarbons from subsea completed wells in three fields through the fixed platform, Canyon Station, to facilities onshore.[23]  The umbilical line provides communication, power, hydraulics

---

[18]Revised Pre-Trial Order (PTO), Section 7 - Listing of Uncontested Facts at Item #1 [Rec. Doc. # 336]; Trial Testimony of Kevin George Hannaford (hereinafter "Hannaford") at Vol. I/A.M. Session at pp. 68-69  [Rec. Doc. 352].

[19]Hannaford, 1/6/09 A.M./Vol. I at pp. 65, 68, 71 (explaining that the Canyon Express System is a "tieback" system of approximately 57 miles).

[20]*See id.*

[21]*See* Canyon Express System Operating Agreement [Plaintiff's Exh. 349]; Attachment to Canyon Express Pipeline System Operating Agreement dated June 1, 2000 [Plaintiffs' Exh. 361]; Summary of CEPS Ownership Interest Pie-Chart [Plaintiff's Exh. 362]; Hannaford at 1/6/09 A.M./Vol. I at pp. 68-70.

[22]Trial Testimony of Richard Case (hereinafter "Case"), 1/8/09 A.M./Vol. III, at pp. 12, 32 [Rec. Doc. 356].

[23]Hannaford, 1/6/09 A.M./Vol. I, at p. 65.

and chemical inhibitors to the subsea completed wells.[24]  The methanol line (SMDL) carries methanol from Canyon Station to the subsea completions, where it is injected into the gas flow lines to prevent the formation of hydrates,[25]  which can plug a line obstructing the flow of hydrocarbons.[26]

In June of 2003, Total commissioned a cathodic protection survey of the CEPS, including videos of the length of the lines.  "The Canyon Express CP Base Line inspection survey [was] intended to serve as the base line Cathodic Potential (CP) Inspection to evaluate the early performance and condition of the CP system installed as part of the development."[27]  Although the pipelines, other fixtures in all of the fields and known pipeline crossings were surveyed,[28] the purpose was not to determine whether a "trench" existed to the east and west of the CEPS at any particular point.  Indeed, there was approximately 100 to 150 feet between each of the lines.[29]  The June, 2003 cathodic protection inspection included the "two 12" Flow Lines, Platform Risers/J-Tubes, Single Methanol Distribution Line (SMDL), Electrical/Hydraulic Umbilical,

---

[24]*Id.*, at p. 67.

[25]*Id.,* at p. 65.

[26]*Id.,* at p. 67.

[27]CP Baseline Inspection Report at Section 2.1 Inspection Scope [Plaintiffs' Exhibit 376-0004].

[28]*Id.*, at 367-0023-26, 0041-44, 0058-61, 0066-70; *Id.* at Section 8.1 (noting that the East 12" Flow Line moved to the west at the Equillon 16" crossing and that on the second phase of the Canyon Express project a crossing correction was conducted to prevent further movement of this Flow Line) [Plaintiff's Exh. 376-00075.

[29]Hannaford, 1/6/09 A.M./Vol. I, at p.72.

Flow Line Sleds, Jumpers, Subsea Trees, Pigging Jumper and all in-field subsea structures."[30] Most notably, the "Summary of Daily Events" reports that "ROV was unable to complete the last 3000' of the SMDL inspection from the platform, due to extremely poor visibility and *the depth of the burial of the SMDL line.*"[31] In addition, regarding anode protection, it was noted that "[t]he amount of protection and life span projection showed to vary as the SMDL line increases in depth;" moreover, "a considerable change was also noted as the SMDL line travels through King's Peak, Aconcagua and Camden Hills field sites."[32]

## Post-Hurricane Ivan Inspections and Start-Up of CEPS

Plaintiffs received notification that Diamond's rig OCEAN STAR (OS) had suffered a mooring failure during the storm and was adrift.[33] It is undisputed that OS was moored just beside the CEPS at the time of Hurricane Ivan on September 15, 2004. The path of the OS was recorded[34] and Diamond Offshore was contacted for the coordinates of the track of the rig adrift during the storm.[35] On September 16, 17, 2004, a quick visual assessment was conducted via

---

[30]CP Baseline Inspection Report at Section 2.1 Inspection Scope [Plaintiffs' Exhibit 376-0004].

[31]*Id.,* at Section 5.2 re June 20th, 2003 thru June 25, 2003 (emphasis added) [Plaintiffs' Exhibit 376-0012]; *See also* SMDL and Electrical Overview (noting that SMDL and E/H Umbilical were inspected out 350' south of Canyon Express platform) [Plaintiff's Exhibit 376-0018].

[32]*Id.*, at Section 7.5 re SMDL inspection [Plaintiffs' Exh. 376-0057]; *see also* Case, 1/8/09A.M./Vol. III, at p. 36 (noting that there were some anodes deteriorating faster than expected).

[33]Hannaford, 1/6/09 P.M./Vol. I, at pp. 5-6.

[34]PTO, Section 7 "Listing of Uncontested Facts," at Item ## 13 and14.

[35]Hannaford, 1/6/09 P.M./Vol. I, at p. 6. *See also* E-mail Correspondence re Coordinates of Ocean Star tracks/Intec Engineering Diagrams [Plaintiffs' Exh. 8-0016 through 0026].

helicopter of each of the plaintiffs' offshore facilities.[36]

To further check for damage, TOTAL commissioned a side scan sonar survey (SSS) of the CEPS which was conducted from September 25, 2004 to September 30, 2004; the SSS survey report was provided to TOTAL after October 29, 2004.[37]  The daily reports and survey results showed no damage to the CEPS at the locations where OCEAN STAR crossed the pipelines.[38]

Plaintiffs placed the CEPS back in service at the end of October, 2004.[39]  Production was restarted with pressure integrity; the first report of a problem was December 3, 2004.[40]  Because of a grounding problem on one of the turbines, all of the wells "tripped" and were "shut-in."[41]  Upon restarting the methanol line on December 3rd, the methanol pressure spiked and suddenly dropped off – indicating a leak — and the CEPS was completely shut-in again.[42]  It was later determined in December of 2004 that there was a methanol leak around one of five features (a possible scar or scour mark at mile 6) indicated earlier by Intec during their September, 2004 SSS survey.[43]

---

[36]*Id.*, 1/6/09 P.M./Vol. I, at pp. 9-10, 12.

[37]PTO, Section 7 "Listing of Uncontested Facts," at Item #15.

[38]Hannaford, 1/6/09 P.M./Vol. I, at p. 18.

[39]*Id.,* at pp. 103, 110.

[40]*Id.,*at p. 31.

[41]*Id.*, at pp. 31-32.

[42]*Id.,* at pp. 31-32, 107-108

[43]*Id.*, at pp. 112-115.

TOTAL located the methanol leak on January 1, 2005.[44]

## The OCEAN AMERICA ("OA")[45]

The OA is a self-propelled semi-submersible drilling rig built in 1988. In September of 2004, Diamond Offshore (Trinidad), LLC was owner and Diamond Offshore Company was charterer of the rig.[46] The OA uses eight mooring lines. In September of 2004, each of the mooring lines were comprised of about 4,500 feet of 3.5-inch mooring wire, 4,500 feet of 3.25-inch anchor chain, and interconnecting hardware known as "jewelry."[47] Five of the eight anchor chains were 16 years old.[48] However, in April of 2004 in the shipyard in Brownsville, Texas, EMM implemented one of Capt. Visentin's recommendations to remove short lengths (damaged portions) of the chains and replace them.[49] Diamond amply demonstrated that it did not commit any negligence that contributed to the Plaintiffs' pipeline damage.

The applicable industry standards for design of rig moorings for Mobile Offshore Drilling Units (MODUs) prior to Hurricane Ivan are set forth in the American Petroleum Institute ("API") RP 2SK; the guidelines applicable to inspection of mooring components at that

---

[44]*Id.*, at pp. 37-38; PTO, Section 7 "Listing of Uncontested Facts," at Item # 23.

[45]Picture of OCEAN AMERICA [Defendants' Exh. 4].

[46]PTO, at Section 7, Item ## 4-6 at p. 20 [Rec. Doc. 336].

[47]*Id.,* at Item # 7.

[48]*Id.,* at Item # 8.

[49]*See* EMM's Report (EMM surveyed all but the two chains that were replaced with new chain that was in storage) [Defendants' Exh. 18]; Brown, 1/9/09 P.M./Vol. IV, at pp. 126-131; Deposition of Capt. Tom Visentin at pp. 146-48 (testifying that he made two recommendations and that the shipyard engineer made the determination to implement one of his recommendations – *i.e.*, to remove/replace the short lengths of chain that were damaged).

time are detailed in the API RP 2I.[50]  Dr. Kwan, who was instrumental in drafting these

standards,[51] explained that the API standards only required that the OA's moorings be designed

to withstand five (5) year storm conditions.[52]  Diamond, being more conservative, selected the

10-year return period as the basis of their mooring design – *i.e.*, the OA's moorings' were

designed to withstand ten (10) year storm conditions.[53]  Dr. Kwan noted that different types of

analysis may be used to satisfy API RP 2SK (applicable to mooring design) – *i.e.*, either (1) the

less accurate quasi-static analysis[54] which requires a greater margin of safety or (2) the dynamic

analysis,[55] which incorporates a full complement of movements making it more accurate and thus

requiring a slightly lower margin of safety.  Consulting the table applicable to mobile mooring,

he further explained that, in the case of the OA moored at VK-917, meeting the appropriate

standard under either analysis constitutes compliance with API RP 2SK, stating that:

> If you are away from the other structures, which Diamond's Ocean America is at
> VK-917, you can either use quasi-static or dynamic analysis, and then all you
> need to do is intact mooring [and not the damaged mooring analysis].[56]

---

[50]*See* Transcript of the Testimony of Chi-Tat Thomas Kwan ("Kwan"), 1/13/09 P.M./Vol VI at pp. 79-80 [Rec. Doc. 363].

[51]*Id.*

[52]*Id.,* at p. 98.

[53]*Id.,* at pp. 100.

[54]Quasi-static mooring analysis assumes a constant force and only two degrees movement.  *Id.,* at p 95.

[55]Dynamic mooring analysis incorporates all line motions (surge, sway, heave and three rotational movements) so that it represents the real movement of the vessel and the real movement of the mooring line.  Kwan, 1/13/09 P.M./Vol VI, at pp. 94-95.

[56]*Id.,* at p. 102.

Analyzing the OA's mooring design and using the best available information regarding the rig's "as-laid" mooring and the dynamic analysis, Dr. Kwan concluded that the mooring design complied with both the 5-year API RP 2SK standard and the more conservative 10-year storm conditions "with a comfortable margin."[57]  Suffice it say, the OA's mooring at VK-917 on September 15, 2004 met or exceeded industry standards.[58]

The evidence further establishes that Diamond complied with the standards applicable to inspections of the rig's mooring components.  Less than six months before the rig deployed to VK-917, the anchor chains of the OA received a full API RP 2I inspection by both Captain Ionescu and third-party inspectors (EMM) at the shipyard in Brownsville, Texas.[59]  Two of the eight anchor chains installed on OA were new chain.[60]  EMM Offshore's April 2nd, 2004 Final Mooring Chain Inspection Report indicates that inspections were conducted in accordance with API Recommended Practice 2I (API RP 2I guidelines).  Said report is comprised of all of the inspection data indicating that every link of every anchor chain of the OA received a complete

---

[57]*Id.*, at pp. 103-104.  *See also* Brown, 1/9/09 P.M./Vol. IV at pp. 143-144 (admitting that the dynamic analysis is more sophisticated and that you don't need to input the "exactly precise" mooring configuration – an approximation of the location of the lines is sufficient).

[58]Kwan, 1/13/09 P.M./Vol VI at p. 105.  *See also* Delmar Systems, Inc.'s Motion Mooring Analysis dated 5/19/04 re OCEAN AMERICA VK 917 & 962  (detailing a frequency domain line dynamic mooring analysis for the OA on both locations VK-927 and VK-962, utilizing an all rig-component mooring system and considering both intact and damaged conditions, and concluding that the OA showed comfortable FOS levels for both the intact and damaged scenarios under the DeepStar II 10 year high wave current applied around the rig at both locations –i.e., that Ocean America met API standards at VK-917) [Plaintiffs' Exh. 42]; Brown, 1/9/09 P.M./Vol. IV at pp. 119,120-121 (who did not attempt to replicate Delmar's analysis and, instead, only attempted to replicate Mr. Kincaid's flawed quasi-static analysis which was calculated using the wrong size of chain).

[59]Capt. Radu Ionescu, 1/13/09 A.M./Vol. VI at pp. 4-12.

[60] *Id.* at 12.

inspection.[61]

The OA's anchor wire was inspected by rig personnel every time the rig moved. Periodically, the lay length was measured because a change in lay length is indicative of problems with the core, which cannot be visually inspected. The wire rope on the OA was inspected six (6) times in 2004 before she deployed to VK-917, including less than two weeks before the storm when OA prepared to move from VK-962 to VK-917.[62] Moreover, a post-Ivan inspection of each of the OA's mooring wires confirmed that there was no internal corrosion nor lack of lubrication.[63] Dr. Kwan noted that the results of tensile strength tests of three of the four wires demonstrated that they were close to 100% breaking strength, with only one showing results a few points below 90%. He explained that these results are not unusual and should be expected, considering the overloading that these wires withstood for a period of time under the conditions imposed by Hurricane Ivan, which should have caused significant weakening.[64]

Long before the discovery of any damage to the CEPS system, including the SMDL

---

[61]EMM Offshore Final Report of Mooring Chain Inspection re Diamond Offshore Drilling Rig OCEAN AMERICA located in Amfels Shipyard, Brownsville, TX (Inspection Dates March 17th to April 2nd, 2004) [Defendant's Exh. 18].

[62]Ionescu, 1/13/09 A.M./Vol. VI at pp. 13-15.

[63]Kwan, 1/13/09 P.M./Vol.VI at p. 128; Dr. Courtney Busch's Photographs [Plaintiff's Exhibit 180 at 183-84 (Sample 1), 189-94 (Sample 2), 195-97 (Sample 3), 200-201 (Sample 4), 211-14 (Sample 5), 219-20 (Sample 6), 225-26 (Sample 7), 228-29 (Sample 8), 236-37 (Sample 9) and 241-45 (Sample 10)]; Ionescu, 1/13/09 A.M./Vol. VI. at p. 84 (noting that he could see more than sufficient lubricant referring to the pictures Dr. Busch took and further stated that, as to the wire being taken on the boat and cut up, he observed "grease everywhere, especially at the core, very well lubricated").

[64]Kwan, 1/13/09 P.M./Vol. VI at pp. 125-126. *See also* Brown, 1/9/09 P.M./Vol. IV at pp. 124-125 (admitting that even post-Ivan, three of the OA's wires tested at least at 90% of their rated breaking strength).

failure SMDL (methanol line) failure on December 3, 2004, marine surveyors determined that all wires of the OA failed at or *near the fair leads*.  Indeed, Operations Manager Jim Watson noted in e-mail correspondence *dated October 20, 2004*:

> Page two of the [Marine Survey Report Re Ocean America] has a spread sheet with moorings as laid out on the original ... America location.  Please note that prior to the evacuation the moorings were relaxed for optimum survival conditions.  All wires were slacked off 400'.  **The wires parted at or near the fairlead with the exception of #5 which parted 150' below the fairlead and #8 which parted 150' below the fairlead.**[65]

Most notably, Dr. David Brown based his opinion in large part on the assumptions that the OA's anchor chain broke – *i.e.*, like the chain found at the end of "the trench" in VK-823 west of the CEPS  – and that "Deep Down" mooring leg was, in fact, OA's anchor chain and wire.[66]  The existence of the so-called  "trench," as discussed in later in this opinion in greater detail, provides no support for Dr. Brown's opinion that the OA's anchor chain broke. Moreover, Dr. Brown's drift analysis shows that runs 1 through 4 – *i.e.*, the runs that most closely parallel the alleged "trench"– all placed the rig to the northeast of where the OA was originally moored,[67] which is miles from where the OA was actually recovered post-Ivan – *i.e.*, south and west of its original location.[68]  None of Dr. Brown's drift models account for the rig

---

[65]E-mail Correspondence from Jim Watson Operations Manager Ocean America/Ocean Warwick dated October 20, 2004 (bolding emphasis supplied) [Defendant's Exhibit 63].

[66]Brown, 1/9/09 P.M./Vol. IV at pp. 131-138 (admitting "that's one of the assumptions [he] made and that his opinion was further supported by the existence of "the trench" and his mooring drift modeling/analysis).

[67]*Id.* at pp. 140-142.

[68]PTO at Section7 "Uncontested Facts," Item # 10.

ending up at the location where the OA was recovered post-Ivan.[69]

Plaintiffs' argument regarding the corruption or compromise of Diamond's "fail safe" design[70] is of no moment.  Regardless of whether Diamond employed anchor chain that was weaker than the mooring wire, the facts are that *all of the wires* on OA failed at or near the fair leads on September 15, 2004 when ten-year storm conditions were exceeded.  Moreover, Dr. Kwan's opinion that there is no proven way to ensure, by *ordinary* design, that a mooring system fails at the fair leads[71] is supported by other credible evidence.  For instance, the experience of BP's drilling rig Noble Jim Thompson (NJT), which also broke away during Hurricane Ivan, bears out Dr. Kwan's conclusions.  Indeed, the NJT's legs broke up and down the lines from the fairleads (legs No.3 and No.5) down to "the lower pee wee socket (leg No. 6) and the Kenter link of the anchor chain (leg No. 1)" – *i.e.*, not "fail safe" locations.[72]  Most notably, NJT had a

---

[69]Brown, 1/9/09 P.M./Vol. IV, at pp. 140-142 (admitting that, when he ran the same drift models with respect to the OCEAN STAR, the simulation placed the OS approximately right where the OS was found post-Ivan).

[70]In this regard, plaintiffs refer to the following: (1) Capt. Ettle's testimony that the OA's mooring approach included a weak link at the fairlead so that, if there was failure, there would be no dragging mooring lines behind the rig [Capt. Ettle 1/14/09 A.M./Vol. VII, at p. 69]; and (2) Dr. Brown's characterization of the OA's mooring design as "fail safe" because the opportunity for subsea damage is minimized when a mooring line breaks at the top end and does not drag wire rope/anchor chain across the sea floor. [David Brown, 1/9/09 P.M./Vol. IV, at pp. 81-90].

[71] *See* Kwan, 1/13/09 P.M./Vol. VI at p. 117 (explaining that the only way to ensure failure at a location on the wire by design is to install a remote control explosive device).

[72]*See id.,* at pp. 120-121; David Tein's Assessment of Mooring Damage Sustained by NOBLE JIM THOMPSON in Hurricane Ivan (Tein's Assessment re NJT), at p. 16 (Figure 2.9 Post-Ivan Field Observations-Mooring Damage Locations) [Plaintiffs' Exh. 96].

mooring design similar to the one endorsed by Dr. Brown;[73] nevertheless, it dragged mooring lines across the sea floor during Hurricane Ivan.[74]  Neither the purported "trench" nor Dr. Brown's drift models lend credence to his opinion that one of OCEAN AMERICA's legs broke at the anchor chain.  Moreover, as Vander Voort credibly testified, the impact caused by the passage of 4,000 feet of anchor chain weighing approximately 100 pounds per link would have "pulverized" and  "crushed and destroyed" the methanol pipeline.[75]

<h3 align="center">"The Trench"</h3>

The lynchpin of plaintiffs' case is the purported "trench" allegedly connecting the mooring site of the OA at VK-917 to the damaged section of pipeline.  Much of the plaintiffs' case rests upon their theory that "a trench"– a singular linear feature video surveyed on the sea floor – runs from OA's pre-Ivan mooring site across the CEPS in the vicinity where the damage to the SMDL (methanol) and umbilical lines were discovered.  According to plaintiffs' theory of the evidence, the "trench" ends at VK-823 where a length of anchor wire (Deep Down) was recovered and the allegedly offending anchor chain remains.[76]

Plaintiffs contend that circumstantial evidence of causation is overwhelming.  The Court is not persuaded by the evidence submitted in support of plaintiffs' "trench" theory of causation.

---

[73]*See* Kwan, 1/13/09 P.M./Vol VI, at pp. 122-123 (discussing the option for upgrading the mooring system suggested by Dr. Brown – *i.e.*, placing a buoy on the mooring line).

[74]*See* Tein's Assessment re NJT, at p. 8 ("Four trenches, which appear to be caused by Legs 2, 7, 8 and 9, were identified on the seabed heading to the southwest crossing Okeanos pipelines.") [Plaintiffs' Exh. 96].

[75]Vander Voort, 1/12/09 P.M./Vol. V, at pp. 10, 14.

[76]*See* PTO at Section 6 "Plaintiffs' Brief Summary of Material Facts" at pp. 3-11.

The undisputed facts establish that there are mature sessile life forms[77] and a substantial amount of half-buried debris in the alleged trench. Oceaneering's video survey of "the trench" shows mature sea anemones,[78] a "crab house,"[79] tube worms,[80] sponges[81] and coral attached to the trench and features located at the epicenter of the purported "trench" at various intervals along its alleged path. "The trench"video survey was created in January of 2005 within four months of Hurricane Ivan, which struck VK-917 on September 15, 2004.

Dr. Ian MacDonald testified that the aforestated sea life forms found in the trench are stationary, take years to mature[82] and could not have possibly established themselves in the alleged "trench" within 120 days between the September 15, 2004 storm (Ivan) and the date of the commencement of the video survey in January of 2005. Indeed, the presence of these life forms establishes as a matter of scientific fact that the seabed *features* making up the alleged "trench" pre-existed Hurricane Ivan for a period of many years.[83] Similarly, the presence of half-

---

[77]Sessile (meaning immobile) life forms are marine invertebrates that, as juveniles, attach themselves to one place with some kind of pedal disc or other material becoming cemented there and thus spend their entire lives through adulthood essentially rooted in one spot. MacDonald, 1/14/09 A.M./Vol. VII, at p. 100.

[78]MacDonald, 1/14/09 A.M./Vol. VII, at p. 101; MacDonald 1/14/09 P.M./Vol. VII, at pp. 41, 47, 50.

[79]MacDonald, 1/14/09 A.M./Vol. VII, at pp. 103-04.

[80]*Id.*, at pp. 105-08 (noting that (1) tubeworms have a growth rate of less than a centimeter a year, (2) the colony in the frame grab was not crushed merely flattened but reasonably healthy and (3) the passage of a 3000 feet or more of anchor chain would have pulverized these organisms).

[81]MacDonald 1/14/09 P.M./Vol. VII, at p. 41.

[82]*Id.*, at p. 45.

[83]*Id.,* at p. 50.

buried man-made debris[84] indicates that the features depicted in Oceaneering's ROV video survey pre-existed the September 15-16, 2004 storm.[85]

The so-called "trench" is neither contiguous nor a single, straight-line feature.[86]  It appears, disappears,[87] changes characteristics (size, width, depth, angular dimensions) and even forks at one or more points.  There is nothing convincing to indicate a temporal or causal link between this chain of  multiple and varied features (and lack thereof from time to time) to either Hurricane Ivan, plaintiff's pipeline damage (the umbilical and the SMDL lines which were buried in the sea floor) or the Ocean America.[88]

Dr. MacDonald explained that changes in the speed of a rig as it dragged an anchor chain could not account for the either complexity or the varied characteristics of the purported "trench."  In that regard, he explained that variations in speed of a rig adrift trailing an anchor chain would do nothing other than raise and lower the catenary.[89]  Dr. MacDonald further highlighted several examples, wherein the so-called "trench" changed rapidly – within less than

---

[84]MacDonald 1/14/09 P.M./Vol. VII, at p. 60

[85]*Id.*, at p. 53.

[86]MacDonald, 1/14/09 A.M./Vol.VII at pp. 88; *see also* MacDonald 1/14/09 P.M./Vol. VII, at pp. 39, 62, 65.

[87]Dr. MacDonald testified he added the description "absent" as a trench characteristic category to his study of the frame grabs, when his evaluators complained that there was no evidence of a "trench" to characterize in a number of the video frame grabs. *See* McDonald, 1/14/09 P.M./Vol. VII, at p. 30.  Dr. MacDonald's evaluators marked approximately 600 of the frame grabs as "absent" (meaning that their was no evidence of a "trench").  *See id.*, at 34.

[88]*See id.*, at p. 70.

[89]McDonald, 1/14/09 P.M./Vol. VII, at pp. 17-18, 39.

a minute – during which time the ROV traveled approximately 50 feet.[90]  Considering all of the features observed viewing Oceaneering's video survey of "the trench" and summing up his conclusions, Dr. MacDonald testified that the single passage of chain approximately 4,000 feet in length with chain links the size/width of Defendant's Exhibit "5" would not have caused all of the various features that he observed.[91]

### Wire Rope (Deep Down) and Chain at the End of the Purported "Trench"

Plaintiffs contend that the wire rope recovered from the sea floor by Plaintiffs several miles west-northwest of the CEPS at the end of the purported trench came from the OCEAN AMERICA.  In this regard, plaintiffs suggest that the evidence demonstrates that OA dragged its mooring components (wire rope and anchor chain) across the CEPS as it drifted during the storm, which accounts for the damage to all four lines comprising the "tieback" to Canyon Station.  This Court disagrees.

Plaintiffs elected not to recover the anchor chain connected to the "Deep Down" wire recovered from the sea floor.  In e-mail communications dated April 25, 2006 regarding abandonment of anchor chain recovery operations, TOTAL's Facilities Engineer Bryce Gerrits stated:

>  [Y]esterday, it was decided to abandon recovery operations and demob[ilization] of the vessel.  The decision was based on a number of factors: Length of operations... [and] Legal stated that the amount of wire already recovered and the information gathered on location and length of the chain would be sufficient for now.[92]

---

[90]MacDonald, 1/14/09 A.M./Vol.VII, at pp. 90-100.

[91]*Id.,* at p. 99 (concluding that the theory of a single length of chain causing all of these variable features seen in Plaintiffs' Exhibit 353 is implausible).

[92]Email dated April 25, 2006 [Plaintiffs' Exh. 263].

Notably, Capt. Ionescu testified that the anchor chain has identifying markers that would conclusively prove its origins. He explained that Kenter links and pear links bear forged batch numbers, indicating that they are originally certified by ABS; everything purchased for the rig was ABS approved.[93] Every five years, Diamond's rigs (including OA) go into major overhaul and ABS inspectors attend this process.[94] That is how the OA retains its classification.[95]

Capt. Ionescu attended the expedition to attempt to recover the mooring leg (wire and chain) found on the sea floor; he described the evolution as a "poor operation."[96] Capt. Ionescu explained that the vessel and the equipment were inadequate for the job and they (meaning TOTAL's consultants) ended up dropping the chain.[97] He further explained that he could not tell from the pictures taken at the time of the attempt to recover the chain whether it came from OA. He explained that "the pear link shape could be a baldt link" and, "[a]s far as the other connecting links, they're all balled up in the mud;" therefore, "[y]ou can't tell what's what."[98]

Turning to the identification of "Deep Down" (*i.e.* – whether it matches any of the wires used to moor OA at VK-917), the wire rope recovered from the sea floor by plaintiffs bears no identifying markings. Dr. Busch recanted his opinion that the grease samples taken from the

---

[93]Ionescu, 1/12/09 P.M./Vol.V at pp. 136-138. *See also* In Service Mooring Inventory for OA at pp. 2-12 (indicating anchor chain components with ID markings such) [Defendants' Exh. 442].

[94]Ionescu, 1/13/09 A.M./Vol. VII, at pp. 4-5.

[95]*Id.* at p. 5.

[96]*Id.* at p. 45.

[97]*Id.* at p. 46.

[98]Ionescu, 1/13/09 A.M./Vol. VII, at p. 46.

wires were a match.[99] Floyd Joseph Friloux, Jr. of Lubriport, who tested the grease samples

provided by Dr. Busch from "Deep Down" and OA's wires, testified as follows, to wit:

> Q.    So it would be inappropriate for me to characterize your analysis as saying
>       that any of these [grease samples] likely came from the same source?
> A.    Exactly.
> Q.    And it would be inappropriate for me to characterize your report as
>       saying any of these samples probably came from the same source?
> A.    Exactly.
> Q.    And you would take issue with me if I characterized your report
>       that way?
> A.    Right.
> Q.    Because I would be saying something you are not saying?
> A.    Right.[100]

Additionally, the Court finds George Vander Voort's opinion based upon his

metallurgical analysis of the wire rope samples persuasive.[101]  Vander Voort credibly testified

based upon his professional experience at Bethlehem Steel, *inter alia*, that steel wire produced

by different manufacturing processes display different "hardness profiles," and that hardness

profiles can be "unique to the manufacturer."[102]  Utilizing state-of-the-art digital, automated

---

[99]*See* Busch, 1/9/09 A.M./Vol. III, at pp. 59-60 (wherein Dr. Busch testified that he retracted one of the principal opinions in his second report which was based on the analysis performed by Lubriport – *i.e.*, he had previously opined that the similarities in the grease compelled the conclusion that the samples from Deep Down and the wires comprising Legs 2 and 7 of OA came from the same source).

[100]Deposition of Lubriport, Inc. through Floyd J. Friloux, Jr., at pp. 68-69.

[101]Vander Voort is a renowned expert in metallurgy and failure analysis of metals.  He was hired by FEMA to analyze the World Trade Center collapse and by the Nuclear Regulatory Commission to resolve a dispute among experts regarding the Three Mile Island failure.  His works are relied upon by organizations establishing the standards for metallurgical analysis, such as ASM and ASTM – *i.e.*, the standard that governs the micro-hardness testing performed in this case.  *See* Resume of George F. Vander Voort [Defendants' Exh. 203]; Vander Voort, 1/12/09 A.M./Vol. V. at pp. 112-120.

[102]Vander Voort, 1/12/09 P.M./Vol. V. at pp. 45-46.

equipment to conduct hardness testing, Vander Voort demonstrated the principle and determined

that the 6X47 wire samples taken from the OA displayed a hardness profile consistent with "cold

drawing" (the method used by the manufacturer of all of OA's wire [Bridon]), meaning that the

wire strands were harder at the edges and somewhat softer in the middle, representative of steel

produced in a conventional process.[103]  Vander Voort explained:

> This Knoop hardness increasing this way.  This is the distance below the surface
> in thousandths of an inch.  At the extreme surface, we have lower hardness values
> because the surface of the wire has lost its carbon content, decarburized, and is
> not at its highest strength.  It immediately jumps up to a higher level.
>
> You can see, with the Bridon wire, the hardness is constantly dropping to a value
> down around 450 at the center; whereas with the sea floor wire, the hardness stays
> very constant for quite a distance in about forty-thousandths of an inch and then it
> drops off.[104]

Ultimately and based upon the results of his analysis of the hardness profiles of the wires

from OA (Bridon wires), Vander Voort found that said wires had a more conventional drawing

process (*i.e.*, cold drawing),[105] to wit:

> Cold drawing, drawing where they don't put as many passes in, they don't
> introduce much cold work.  So, basically, you're overdrawing the surface and not
> really affecting the center much.  Whereas the Deep Down wire, or the wire from
> the seafloor, has a profile much more like what we had in the Bethlehem wires,
> and that is the profile that is much more uniform going from the surface to center.
> That is a distinctive difference.[106]

Vander Voort determined that the Deep Down sea floor wire and the Bridon wires from the OA

did not match.  He further opined that, for Knoop hardness testing, the computer automated

---

[103]*Id.,* at p. 59.

[104]*Id.,* at p. 58.

[105]*Id.,* at p. 59.

[106]Vander Voort, 1/12/09 P.M./Vol. V, at p. 59.

testing is far more reliable, much less fatiguing for the operator and it is independent of operator interference.[107]  As to the three wires that Vander Voort examined, all three were 6X47 IWRC (right regular lay) and none had an ID tag – *i.e.*, no ID tag was found in Deep Down and Bridon does not use ID tags.[108]

Plaintiffs' expert (Dr. Busch) employed WTL's technician Girish Malani ("Malani"), who utilized dated manual testing equipment.  Malani considered manual testers more reliable than automated testers;[109] however, he admitted that he had no prior experience comparing manual and automated testers and thus could not base his opinion on any prior experience.[110] Plaintiffs' consultant also relied on manual measurement techniques as opposed to computer operated digital measuring devices, thereby introducing the prospect of human error into the analysis.[111]  At the time WTL performed the hardness testing for Dr. Busch, the company technician was not informed that his measurements were being used to determine a hardness profile for the wires tested;[112] in recording the results, Malani *averaged* the hardness measurements.[113]  Finally, Malani admitted that he had never used a Knoop hardness test to compare hardness profiles of different wires and he agreed that *his* measurements were too

---

[107]*Id.,* at p. 60.

[108]*Id.,* at pp. 64-65.

[109]Girish K. Malani, 1/12/09 A.M. Vol. V, at p.  55.

[110]*Id.*

[111]*Id.,* at p. 67 (admitting that when he compared his measurements to the indentation chart he was "eyeballing the midsection of the sample").

[112]*Id.,* at pp. 72,79

[113]*Id.,* at p. 72.

unreliable to compare the hardness profiles of the wires that he tested.[114]

In sum, the analysis presented by Vander Voort was based upon reliable methodology and his opinion convinces the Court that Deep Down was no match for any one of the OA's wires. Moreover, the Court finds his testimony differentiating the Deep Down wire and the OA's Bridon wires on the basis of their unique manufacturing process, *inter alia*, both credible and far more persuasive than the plaintiffs' expert, Dr. Busch, who based his analysis on inexactly recorded hardness testing results, *inter alia*.

### Pipeline Damage

As Vander Voort carefully explained, the visible damage to the methanol line shows that it occurred from the inside out – *i.e.*, the line ruptured from the inner diameter to the outer diameter. He testified that the rupture site showed a "ductile fracture" caused by over-pressurization (meaning that the line experienced pressure to the point that it caused the line to fail).[115] It is undisputed that the line experienced a series of pressure spikes several months after the passage of Hurricane Ivan. Moreover, it is undisputed the line failed on December 3, 2004. Vander Voort credibly testified that passage of a 4,000 foot anchor chain weighing in excess of 100 pounds per foot would have in all probability "pulverized," "crushed and destroyed" the methanol pipe and not caused the slight kink, sag or small bend to the west.[116] Vander Voort explained that, based upon the relative hardness of the metals (chain link *vis a vis* pipe wall), he would expect "massive damage" to the pipe and that it would have moved "quite a distance from

---

[114]Malani, 1/12/09 A.M. Vol. V, at p. 81.

[115]Vander Voort, 1/12/09 P.M./Vol. V, at p. 115.

[116]Vander Voort, 1/12/09 P.M./Vol. V, at pp. 14, 102, 103, 104.

where it was originally located."[117]  Moreover, Vander Voort closely reviewed Oceaneering's video survey of the methanol pipeline excavation/damage and noted that he saw no evidence of any disturbance in the mud or any "trench" in the vicinity of the SMDL (methanol line).[118]

Contrary to Dr. Busch, Vander Voort found no evidence of either adiabatic shear or explosive impact welding. He noted that adiabatic shear is something found in ballistics, such as when a projectile is shot into armor at a very high rate of speed (hundreds of miles per hour).[119] As to explosive welding, he pointed out that there was no explosive charge and nothing running a chain into the pipe at a speed of 3,000 miles per hour.[120]  Moreover, it was undisputed that both the methanol and umbilical lines were buried under a fairly large layer of sediment.[121]

Vander Voort further observed that there was no evidence of "fatigue" failure and explained that fatigue failure is very flat and featureless in comparison to the fracture at issue. His opinion was that the fracture was obviously ductile,[122] pointing to the "hawk-beak image," which "*was* sticking out but was later pressed inward by the wire brushing and clamping

---

[117]*Id.,* at p. 15.

[118]*Id.,* at p. 105

[119]*Id.,* at p. 15.

[120]*Id.,* at p. 16.

[121]*See id.,* at pp. 19-20 (referring to Oceaneering's DVD's [Plaintiffs' Exh. 353]).

[122]Vander Voort explained ductile failure happens in one cycle from overload apparently caused by over pressurization spikes and with the slight bend, the pressure could build in the area just below the bend.  The pipe obviously burst from inner diameter (ID) to outer diameter (OD), pointing to the ductile massive shear lips sticking up on the methanol pipe.  Vander Voort, 1/12/09 P.M./Vol. V at pp. 25-30.

operations later employed in an effort to fix the leak."[123]

Moreover, dealing with the physical evidence and comparing the damages to the methanol pipeline and the umbilical, Vander Voort stated that the damage appears different *in the picture*, in that the umbilical damage appeared to be a crushing type of damage – *i.e.,* something dropped on it.[124]  Moreover, Vander Voort pointed out that the video surveys show bare spots on the east and west gas lines in a number of places and that the methanol and umbilical lines were not examined beyond the area of the damage that was excavated.[125]  With respect to the methanol pipe, Vander Voort attributed the flattening of the pipe at the top to the clamping pressure brought to bear post-failure.  He explained that the wall thickness was less at the area of the fracture, both because of the ductile fracture *and the wire brushing operation*; so, when the clamp was applied the pipe was flattened at the fracture site and deformed downward.[126]

It is undisputed that the methanol line burst during a series of pressure spikes that occurred after Ivan.[127]  There is insufficient evidence linking the wire/chain of any leg of OA to the type of damages sustained by the CEPS post-Ivan.   Moreover, the methanol line did not fail

---

[123]*Id.,* at pp. 25, 26, 33-36 (referring to Plaintiffs' Exh. 180-321, 180-176, 180-620).

[124]*Id.,* at pp. 31, 106, 107 (noting the umbilical was caved in and the methanol line showed a ductile fracture from ID to OD, plus he saw no "trench"). *See also* Photograph of Damage to the Excavated SMDL (methanol line) [Plaintiffs' Exh. # 284]; Photograph of Damage to the Excavated Umbilical Line [Plaintiffs' Exh. #285].

[125]Vander Voort, 1/12/09 P.M./Vol. V, at pp. 107-108.

[126]*Id.,* at pp. 37-41.

[127]Busch, 1/9/09 A.M./Vol. IV, at pp. 74-76 (stating five or six pressure spikes ultimately caused the line to burst – i.e., a classic ductile failure).

until December 3, 2004 and that was the result of a classic ductile fracture (ID to OD) and not due to a smashing/crushing insult – *i.e*., 4,000 feet of anchor chain being dragged across the line. The Court credits the testimony of plaintiffs' expert George Vander Voort – *i.e.*, that such a crushing insult  would have "pulverized" the both the methanol and umbilical lines.

### "Bad Faith" - Sanctions

Defendants submit that the evidence shows that Plaintiffs were aware shortly after Hurricane Ivan that there was a significant possibility that the pipeline was damaged during the storm.  In this regard, defendants highlight that plaintiffs were aware immediately after Ivan of the loss of communications with one of the fields after the storm, suggesting possible damage to the umbilical line.  Diamond further emphasizes that the SSS survey revealed certain targets that were not investigated until months after the report issued in late October, 2004, despite Intec's recommendation to do so.  Moreover, Intec recommended an inspection of the location where the rupture occurred later in December of 2004.

Diamond further argues that plaintiffs vexatiously persisted in representing facts that they either knew or should have known were untrue, including the following: (1) the marks on their pipelines were caused by the passage of wire rope when they knew that the brush marks on the methanol pipeline were caused by their own wire brushing operation post-failure on January 6, 2005 – *i.e.*, information not provided to Dr. Busch until years later; (2) plaintiffs ordered wire brushing of key pieces of evidence thereby permanently damaging the surface of pipe when they knew that litigation would result; (3) plaintiffs wrongly submitted the false affidavit of Dr. Busch both in opposing Diamond's motion for summary judgment and in support of the plaintiffs' own motion for summary judgment; (4) plaintiffs abandoned the attempt to recover

the anchor chain rather than positively establish ownership of the wire rope by recovering the chain; and (5) notwithstanding Dr. Ian MacDonald's review of the "trench" video and identification of sessile life forms thriving therein, plaintiffs recklessly persisted in their trench theory of causation.

Defendants argue that, based upon the foregoing alleged misdeeds, plaintiffs should be sanctioned in an amount equal to the fees and costs incurred by the defendants until February 13, 2008, the date when Dr. Busch changed his position on the cause of the damages. This Court disagrees. Additionally, the Court finds no intentional wrongdoing, including spoliation of evidence as suggested by the defendants.

Regarding the failure to recover the anchor chain, there were problems with the equipment commissioned for the operation and the cost was prohibitive.[128] Turning to the trench theory of causation, persisting with such a theory of is not sanctionable. The Court recognizes that, ultimately, the argument and evidence were not convincing. However, presenting the plaintiff's theory of the case is not considered by this Court to be a sanctionable offense.

Insofar as the wire-brushing and clamping operations performed in mid-January 2005 on the damaged methanol line, the Court cannot find intentional wrongdoing under the

---

[128]*See* Email from Bryce Gerrits date 4/25/2006 (noting that the cost for the Offshore Recover Operation was estimated at $1.85MM not including onshore transport and storage of the wire or the cost of inspections of the Northern Canyon for a 28 hour period) [Plaintiffs' Exh. # 263]; INTEC Engineering Anchor Wire Recovery/Scope of Work dated May 18, 2005 (wherein it is noted that the contractor (not plaintiffs) determined the type and size of DP vessel, the equipment and personnel necessary to complete the job, which originally contemplated recovery and storage of the entire wire and chain) [Plaintiffs' Exh. 264]. *See also* Hannaford, 1/6/09 P.M./Vol. I, at p. 79 (explaining that it was always their intent to recover the chain but that there was a problem when it was raised to the surface – *i.e.*, the grapple that was holding it failed).

circumstances. Most notably, the CEPS had been completely shut-in since December 3, 2004. Plaintiffs had a duty to mitigate their damages and that includes making the CEPS pipeline operational *as soon as possible*. Moreover, plaintiffs were under tremendous pressure to get the system operational.

Albeit not the subject of this bifurcated proceeding, having the entire system shut-in from December 3, 2004 to the end of January 2005 (two months) caused plaintiffs to lose substantial revenue. Prior to that time, in October of 2004, plaintiffs had employed an ROV inspecting the CEPS for damage to the pipelines and for inspections. However, there were other problems which required attention including Matterhorn, Virgo,[129] a communication issue at 305-2 and wellhead 305-4's hydraulic issue.[130] Damage to the methanol line was not located until January 1, 2005[131] and not because of any lack of effort. Umbilical damage was discovered soon thereafter on January 6, 2005.[132]

Hannaford credibly testified that "trying to find a leak in a 57-mile pipeline [was] like looking for a needle in a haystack,"[133] to wit:

> [W]e tried to resource an ROV. I think we got one but he equipment on board, we had severe problems with it, and we had to release the vessel.... We then had to get another vessel to mobilize. Then, once we got one – and each time we could only get a crew two or three days or a few days, and then we'd have to

---

[129]Hannaford explained that the Matterhorn had substantial damage to its topsides and there was severe platform damage on Virgo post-Ivan. *See* Hannaford,1/6/09 P.M./Vol. I, at pp. 23, 90

[130]*Id.*, at pp. 21-23.

[131]*Id.,* at p. 31.

[132]*Id.,* at p. 51.

[133]*Id.,* at p. 43.

release it and get something else.[134]

* * *

The first we did is we'd go into the infield component ... to check the flying leads on King's peak and ... [t]hen Camden Hills....

* * *

[A] calculation suggest[ed] that the leak could be between 10 and 18 miles [on the main line].... [W]e got an ROV ... and focused on the line in the 10 to 18 mile [area]. When we didn't find a leak there, we then started looking the whole length of the methanol line.

* * *

We mobilized a fluorescent device, which could detect flourescent dye, and we started injecting fluorescent dye in along with the methanol to track the line with the fluorescent detector. That didn't work.

* * *

[W]e heard about ... an acoustic device.... [T]hat didn't work.

* * *

It was a systematic approach.... We then went to the nitrogen [injecting nitrogen].... And then we were flying the line [the ROV] picked it up on sonar initially... and they honed in with the ROV camera and saw the bubble.

* * *

[T]here was a lot of pressure from everybody to find the leak and get the facility back up and running.[135]

Hannaford explained that the wire brushing and clamp operation was attempted in the

mid-January, 2005 as an interim solution but was unsuccessful. There was no intention to

destroy evidence. A good seal was necessary to install the clamp, which meant that the

protective coating on either side of the fracture of the methanol line had to be removed. The

wire brushing was necessary to clean the pipe; clamping was necessary as a temporary fix until

the damaged section of pipe could be replaced.[136] The fact that the clamping operation

---

[134]*Id.,* at p. 33.

[135]Hannaford, 1/6/09 P.M. Vol. I, at pp. 34-37, 41-42 (also noting that there was a significant amount of time spent waiting on weather). *See also* Email Report from Hannaford to Illeman dated 12/29/04 (entitled "Overview of the Current Position of the Methanol Detection") [Plaintiffs' Exh. 119].

[136]*Id.,* at pp. 74-76.

ultimately failed is of no moment.  As stated at the outset, *there was tremendous pressure to make the CEPS operational*.

This Court cannot find that any of the actions complained of by the defendants constitute spoliation (an intentional act) or that any course of action was orchestrated in "bad faith" or for the purpose of vexatiously multiplying the defendants' litigation costs.  Accordingly, and for all of the foregoing reasons, Defendants' Motion for Sanctions (Doc. No. 330) is DENIED.

### III.  CONCLUSIONS OF LAW

#### Jurisdiction and Venue

Admiralty jurisdiction under 28 U.S.C. § 1333 is uncontested.  The alleged allision involves defendants' semi-submersible drilling rig operating in navigable waters of the United States within the jurisdiction of this Court.[137] Venue is proper in the Eastern District of Louisiana.

#### Legal Standards

Since this Court's jurisdiction is grounded in admiralty, it is guided by general principles of negligence law.[138]  Liability may be imposed where there is negligence.[139]  "[T]he appropriate standard of care in an allision case is reasonable care under the circumstances."[140]

---

[137]PTO at Section 4 and Section 7, at Item ## 1, 7 and 9.

[138]*Kevin Gros Marine, Inc. v. Weeks Marine, Inc.,* 2008 WL 4534382 (E. D. La. Oct. 3, 2008) (*citing Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65, 67 (5th Cir. 1987).

[139]T. Schoenbaum, ADMIRALTY AND MARITIME LAW § 14-2, at 91 (4th ed. 2004).

[140]*See Stolt Achievement, Ltd. v. Dredge B. E. Lindholm,* 447 F.3d 360, 364 (5th Cir. 2006 ("The applicable standards of care in a collision case stem from traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules and recognized customs and uses."); *Theriot v. U.S.,* 245 F.3d 388, 400 (5th Cir. 1998).

There is a presumption of fault against a moving vessel that allides with a visible[141] stationary object.[142] This presumption derives from the commonsense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way.[143] "This presumption operates to shift the burden of proof-both the burden of producing evidence and the burden of persuasion-onto the moving ship ."[144]

The moving vessel may rebut the presumption by showing, by a preponderance of the evidence, that the collision was (1) the fault of the stationary object, (2) that the moving ship acted with reasonable care, or (3) that the collision was an unavoidable accident.[145]

## Causation

In pipeline damage cases, maritime law allows proof of causation by inferences arising from circumstantial evidence.[146] Plaintiffs in admiralty actions must prove their claims *by a*

---

[141]*Delia Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 450 (5th Cir.1987) ("First, the presumption of negligence has previously been invoked only against moving vessels which damaged wharves, moored vessels, and other stationary, visible objects. We do not think that the presumption should apply to allisions with sunken and hidden objects.").

[142]*The Oregon*, 158 U.S. 186, 197, 15 S. Ct. 804, 809 (1895).

[143]*American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir.1988) (citations omitted).

[144]*Id.*

[145]*Id.* (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488 (1978), *inter alia*, and noting that the district court's judgment can be upheld either on the theory that no collision occurred or on the theory that the ship rebutted the presumption).

[146]*Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa,* 527 F.Supp. 824 (E. D. La.

*preponderance* of either direct or circumstantial evidence.[147]   As a general rule the law makes no

distinction between direct and circumstantial evidence, but simply requires that the plaintiff

prove his case by a preponderance of all of the evidence in the case, both direct and

circumstantial.[148]

## Act of God Analysis

Under the general maritime law, it is well settled that when a drifting vessel causes

damage to a stationary object, there is a presumption that the moving ship is at fault.[149]   This

presumption of negligence is based on the logical deduction that a drifting vessel was

mishandled or improperly moored.[150]   The Fifth Circuit has noted:

> In admiralty, this presumption does more than merely require the ship to go
> forward and produce some evidence on the presumptive matter. The moving
> vessel must show that it was without fault or that the collision was occasioned by
> fault of the stationary object or was the result of inevitable accident.[151]

The presumption thus has the effect of shifting the burden onto the moving ship.[152]   Defendants

must disprove their fault by a preponderance of the evidence.[153]   They can satisfy this burden by

showing that the accident could not have been prevented by "human skill and precaution and a

---

[147]*AEP Elmwood, LLC v. Tesoro Marine Services, LLC,* 2004 WL 1575545 *4 (E. D. La. Jul. 13, 2004) (citing *Skidmore v. Grueninger*, 506 F.2d 716, (5th Cir.1975)).

[148]*See* Fifth Circuit Pattern General Instructions at 3.1.

[149]The LOUISIANA, 70 U.S. (3 Wall) 164, 173 (1865).

[150]*See James v. River Parishes Co., Inc*., 686 F.2d 1129, 1132-33 (5th Cir.1982).

[151]*Bunge Corp. v. M/V FURNESS BRIDGE,* 558 F.2d 790, 795 (5th Cir.1977) (quoting *Patterson Terminals, Inc. v. S/S JOHANNES FRANS*, 209 F. Supp. 705, 707 (E. D. Pa. 1962)).

[152]*Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir.1987).

[153]*James*, 686 F.2d at 1132.

proper display of nautical skills .”[154]   Defendants “‘must exhaust every reasonable possibility

which the circumstances admit and show that in each they did all that reasonable care

required.’”[155]

In *Bunge Corp. v. Freeport Marine Repair, Inc*., the Fifth Circuit explained the analysis

as follows:

> A drifting vessel is presumptively liable for damages “unless it can show
> affirmatively that the drifting was the result of an inevitable accident, or a vis
> major, which human skill and precaution and a proper display of nautical skill
> could not have prevented.” *The Louisiana*, 70 U.S. at 173, 18 L.Ed. 85. The
> burden of proving an inevitable accident or an Act of God rests heavily upon the
> vessel asserting such defense. *Boudoin v. J. Ray McDermott & Company*, 281
> F.2d 81, 88 (5th Cir.1960).[156]

### Sanctions

In the Fifth Circuit, both intentional conduct and bad faith are required to give rise to a

finding of spoliation or destruction of evidence.[157]   The Court previously found that the plaintiffs

neither intentionally destroyed/altered evidence nor acted in “bad faith.”   Causation was hotly

disputed and Dr. Busch’s initial opinion was equivocal as to the instrumentality of the damage –

*i.e.*, wire rope or chain.   Moreover, there was obviously an unintentional mistake made with

respect to the identification of brush marks on the methanol pipeline as having been caused by

the individual wires of a wire rope. Indeed, Dr. Busch admitted that he was unaware of the wire

brushing operation when that first opinion issued.   Moreover, once the mistake was brought to

---

[154] *Id.*

[155]*Bunge Corp.*, 558 F.2d at 795 (quoting *Brown & Root Marine Operators, Inc. v.
Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir.1967)).

[156]*Bunge Corp. v. Freeport Marine Repair, Inc*., 240 F.3d 919, 926 (5th Cir. 2001).

[157]*United States of America v. Wise*, 221 F.3d 140 (5th Cir.2000).

his attention, his initial opinion in that regard was recanted.  For reasons previously assigned, the Court denies defendants' Motion for Sanctions.[158]

## Application of the Law to the Facts

Hurricane Ivan was a classic "Act of God."[159]  It is undisputed that the storm formed in early in September of 2004 and became the strongest southernmost hurricane on record.  It is further undisputed that five semi-submersibles rigs parted their moorings, including OCEAN AMERICA; all but one was cast adrift.  Moreover, the most severe quadrant (northeast) passed over the OA's mooring site at VK-917.  Whether rigged to 5, 10 or 100-year standards, the OA would have lost station at its mooring site.[160]  In 2004, the industry standard for semi-submersible rigs was that they withstand 10-year storm conditions.  Assuming that in this particular case an allision occurred, Hurricane Ivan was a *vis majeure* sufficient to discharge all liability.[161]

In any event and notwithstanding the foregoing, plaintiffs failed to establish that any

---

[158]*See* Findings of Fact, *supra,* at pp. 35-38.

[159]*See In re Marine Leasing Services, Inc.,* 329 F.Supp. 589 (E. D. La.), *aff'd*, 471 F.2d 255 (5th Cir. 1973).

[160]*See* Findings of Fact, *supra*, at pp. 8-12.

[161]*See In re Marine Leasing Services, Inc.,* 329 F. Supp. 589 (E. D. La.), *aff'd*, 471 F.2d 255 (5th Cir. 1973) (affirming the district court's finding that Hurricane Betsy was the inevitable cause or a *vis majeure* considering winds over 90 miles an hour in the Baton Rouge area, hundreds of barges adrift on the Mississippi River and sinking and that no fleet of barges, no matter how well secured, was able to withstand the fury of the storm); *In re International Marine Development Marine Corp.,* 329 F. Supp. 1316 (S. D. Miss.) (finding that Hurricane Camille was a "freak of nature" of sufficient velocity and destructiveness to overcome all reasonable preparations and sustaining the defense of force majeure as to all three vessels involved); *Petition of U.S.*, 300 F. Supp. 358 (E. D. La. 1969) (finding that the defendants overcame the adverse presumption attaching to collisions and sustaining the defense of *force majeure* considering the wind velocity, tidal surge, *inter alia*).

mooring line or anchor chain of the OA carved "the trench" across the CEPS, alliding with the subsea pipeline causing the damage later identified. Defendants amply demonstrated that the Deep Down wire recovered from VK-823 was no match for any of the OA's mooring lines.[162] Vander Voort's testimony differentiating between the wires on the basis of manufacturing process (cold drawing) is unrebutted.[163] As explained at the outset regarding the grease samples from the wires provided by Dr. Busch, Floyd J. Friloux, Jr. agreed that it would be inappropriate to characterize Lubriport's report as saying that any of the grease samples came from the same source.[164]

Neither Dr. Busch's analysis of the recovered anchor wire nor his analysis of the fractured methanol line were convincing. Significantly, Vander Voort's analysis of the fracture site accounted for all of the anomalies observed, including the shear lips caused by ductile forces, the scoring and diminished thickness caused by the significant wire brushing operation post-failure and the out of round/compression of the pipe inward at the site of the fracture (the top) by the clamping operation which was also conducted post-failure and brought significant force to bear on the damaged pipe.[165]

Dr. Brown conceded that none of his "drift models" followed the path of the ROV video-survey of "the trench" nor ended at the location where the OA was recovered post-Ivan. Indeed, Dr. Brown's opinion was predicated on assumed circumstances which were not proved true at

---

[162]*See* Findings of Fact, *supra,* at pp. 26-31.

[163]*See* Findings of Fact, *supra,* at pp. 29-30.

[164]*See* Findings of Fact, *supra,* at p. 28.

[165]*See* Findings of Fact, *supra,* at p. 31-34.

trial on the merits.[166]  These assumptions included that (1) the Deep Down anchor chain dragged across the CEPS and carved a singular feature ("the trench") causing damage to plaintiffs' pipelines and (2) that the Deep Down anchor chain came from one of the legs of the OA.

As aforestated, the "trench" is the centerpiece of plaintiffs' case.  Nevertheless, defendants amply demonstrated *via* the unrebutted testimony of Dr. Ian MacDonald that the purported "trench," is by no manner or means a contiguous, single, or straight-line feature. Clearly, furrows of various sizes appear, disappear, change characteristics and even fork along the ROV's video survey course.  The credible expert testimony of Dr. Ian MacDonald makes short shrift of the suggestion that there is any temporal[167] or causal link between this discontinuous chain of multiple and varied features to Hurricane Ivan, the damage to plaintiff's buried, subsea pipeline or to any particular appurtenance of the Ocean America.[168]  Additionally, Vander Voort noted the *difference* in the type of damage sustained by the four lines including the umbilical and the SMDL.[169]  Vander Voort credibly testified based upon his experience and training that the crushing weight of the passage of 4,000 feet of anchor chain would have "pulverized" both the methanol and umbilical lines.

---

[166]*See* Findings of Fact, *supra*, at pp. 21-22.

[167]*See e.g.,* MacDonald, 1/14/09 A.M./Vol. VII, at pp. 100-108 (discussing anemones, crab house and tube worms); MacDonald, 1/14/09 P.M./Vol. VII, at pp. 41, 45, 50, 60 (noting the presence of features depicted in Oceaneering's ROV video survey of "the trench" existed for a period of years prior to September 15-16, 2004 storm).

[168]*See* Findings of Fact, *supra*, at pp. 23-26.

[169]*See* Findings of Fact, *supra,* at pp. 33-34 (noting Vander Voort's observation that Oceaneering's video survey showed bare spots up and down the East and West gas lines, whereas the umbilical and SMDL lines were not excavated (unburied) and thus not examined much beyond the area of the damage/fracture).

The Court finds that the OA's moorings held beyond industry standards and thus no distinction can be drawn between the rig, its owners and operators and any other reasonably prudent operator.[170] Moreover, the credits the testimony of Captain Ettles, who testified that he considered the idea of a hurricane evasion tow of the OA in violation of the Tropical Contingency Plan to be a dangerous maneuver and that, on September 6, 2004, the OA was obliged to proceed to its next mooring site only two miles away – *i.e.*, from VK-962 to VK-917. As of that date, the storm was not in the Gulf of Mexico and the projected path/cone of probability was the Florida panhandle – not the Louisiana coast.[171]

### IV. SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiffs are not entitled to recover from the defendant. Accordingly,

**IT IS ORDERED** that:

(1) Defendants' Motion for Sanctions (Doc. No. 330) is DENIED;[172]

(2) There be judgment issued in favor of Defendants and against Plaintiffs, dismissing their case in its entirety with prejudice.

(3) Defendant's Motion for Directed Verdict (Doc. No. 346) is DISMISSED AS MOOT.

THE CLERK OF COURT IS DIRECTED TO ENTER JUDGMENT IN FAVOR OF THE DEFENDANTS AND AGAINST PLAINTIFFS, DISMISSING PLAINTIFFS' CASE IN

---

[170]*See* Findings of Fact, *supra,* at pp. 18-20, 22, 23.

[171]*See* Findings of Fact, *supra,* at pp. 8-12.

[172]Plaintiffs' Motion for Reconsideration (Doc. No. 338) is addressed by separate order.

ITS ENTIRETY WITH PREJUDICE.

New Orleans, Louisiana, this 6th day of July, 2009.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**